4 P.3d 1054

**FOREST GUARDIANS, and Jonathan D. Tate, Plaintiffs–Appellants,**

v.

**J. Dennis WELLS, in his official capacity as Commissioner of the Arizona State Land Department and the Arizona State Land Department, Defendants–Appellees.**

**No. 1 CA–CV 99–0258.**

Court of Appeals of Arizona, Division 1, Department D.

April 25, 2000.

Arizona Center for Law in the Public Interest by Jennifer B. Anderson, Timothy M. Hogan, Phoenix, for Appellants.

Janet Napolitano, Attorney General by Theresa M. Craig, Assistant Attorney General, Phoenix, for Appellees.

## OPINION

VOSS, Judge.

¶ 1 In this appeal from the affirmance of an administrative decision, we consider whether the State Land Department and its Commissioner abused their discretion in denying grazing leases to appellants, who wished to rest the lands from grazing for conservation and recreation purposes. We conclude that the Commissioner acted within the law and his discretion and thus affirm the trial court judgment.

## FACTS AND PROCEDURAL HISTORY

¶ 2 In August 1997, appellant Forest Guardians, a non-profit corporation, submitted bids to the Arizona State Land Department ("the Department") on the two grazing leases that are the subject of this appeal. In one, Forest Guardians applied for a ten-year lease on approximately 5,000 acres of state trust land located in Coconino County ("Coconino County land"). This land is bisected by an ephemeral drainage area known as Cataract Creek. The existing lessee of the Coconino County land paid a grazing rental fee of approximately $2,150 per year to graze 85 head of cattle on the land. In its application, Forest Guardians offered to pay twice the amount paid by the existing lessee. It stated on the application that it did not intend to stock the land with cattle; it contended that nongrazing would increase the value of the land to conservationists, prospective livestock interests, and trust beneficiaries. The existing lessee also applied to renew its grazing lease.

¶ 3 In its second application, Forest Guardians applied for a ten-year lease on approximately 162 acres of state trust land in Santa Cruz County ("Santa Cruz County land"). It was interested in this lease because a segment of the Babocomari River runs through the parcel. The existing lessee, who applied to renew the lease, paid $50.16 per year for the grazing lease. Forest Guardians offered to pay five times that amount, also indicating that it would not stock the land with livestock.

¶ 4 In a cover letter accompanying the applications, Forest Guardians requested, pursuant to A.A.C. R12–5–705(O), that the State Land Commissioner ("the Commissioner") authorize the use of the land "for purposes other than domestic livestock grazing." Forest Guardians noted that, based on its higher-than-minimum bids and the important recreational and biological values of the areas, allowing grazing non-use for ten years would enhance the corpus of the trust while also meeting the Department's legal obligation to maximize revenue from school trust lands.

¶ 5 In July 1997, appellant Jonathan Tate also applied for a ten-year lease on approxi-

mately 16,000 acres of state trust land in Pinal County. In his application, Tate offered to pay $4.20 per animal unit month, which was approximately twice the amount paid by the existing lessee. Tate also indicated that he did not intend to use the land for livestock grazing.[1]

¶ 6 By letters to Forest Guardians and Tate, the Department advised them that their applications were subject to rejection because they did not intend to put the lands to the use for which they were classified. The Department informed them that, if they wished to lease trust land for habitat preservation or riparian restoration, they should apply for commercial leases, which would require reclassification of the lands to commercial use.

¶ 7 In a letter responding to the Department's correspondence, Forest Guardians stated that it was "not interested in either withdrawing [its] grazing lease application or in submitting a commercial lease application for the lands at question." Similarly, Tate wrote that he did not intend to graze livestock, was not interested in a commercial lease, would not withdraw his application for a grazing lease, and was requesting that the Commissioner grant him permission for non-grazing use.

¶ 8 The Department denied the lease applications submitted by Forest Guardians and Tate. The Department noted that the applicants' objective of preventing grazing on the properties directly contradicted the intent, policy, and language of the statutes and rules concerning grazing leases. Such an objective, stated the Department, would be consistent with a commercial lease, not a grazing lease, and nonconformance to the classification scheme might prevent the Department from receiving the full appraised value and compensation for the higher use. Thus, the Department concluded, it was "not in the best interests of the State Trust" to approve the applications.

¶ 9 Forest Guardians and Tate appealed from the denial orders. Following hearings, the administrative law judge ("ALJ") recom-

mended that the Commissioner uphold the Department's denials of the grazing lease applications. The ALJ reasoned that the Commissioner did not violate his duty to the trust and trust beneficiaries by denying the applications because the applicants' intended use of the lands did not meet the criteria for grazing leases, and they declined to seek commercial leases. The ALJ concluded, as a matter of law, that A.R.S. section 37–285(H) "does not allow the Commissioner to waive grazing and authorize nongrazing use for an applicant who has no intention of ever using the lands for ranging livestock." Furthermore, stated the ALJ, appellants' offers to pay more than the existing lessees were paying did not give appellants a superior right to use the lands because the value of the proposed conservation and recreational uses could not properly be established solely by an offer to pay more than the estimate of forage usage, which is the basis for annual grazing lease rentals. He noted that, under statutes and Department rules, conservation and recreational use of state trust lands fall under the appraisal process for commercial lease classification. The ALJ also concluded that the Commissioner did not breach his statutory and fiduciary duties by not reclassifying the parcels to commercial lands because Forest Guardians and Tate were the only parties interested in using those lands for other than grazing, and they had stated that they would not apply for or accept commercial leases.

¶ 10 The Commissioner entered an order adopting the recommendation of the ALJ. Forest Guardians and Tate sought judicial review of the decisions.[2] The trial court affirmed the administrative decisions, finding that the applicants had to comply with statutes and regulations in order to exclude the grazing of livestock on grazing lease lands and that they did not ask for reclassification of the parcels in the appropriate manner. Forest Guardians and Tate timely appealed from the trial court judgment.

---

1. Tate did indicate in his application that, "if turned down on nongraze, we will graze a minimum amount." He later omitted that contingency in a subsequent letter clarifying his intent.

2. The actions filed by Forest Guardians and Tate were consolidated in the trial court.

## DISCUSSION

### A. Standard of Review

¶ 11 When we review the superior court's judgment in an appeal from an administration decision, we must reach the underlying issue whether the administrative action was illegal, arbitrary, capricious, or involved an abuse of discretion. *See Havasu Heights Ranch & Dev. Corp. v. Desert Valley Wood Products, Inc.,* 167 Ariz. 383, 386, 807 P.2d 1119, 1122 (App.1990). Neither the superior court nor this court weighs the evidence; instead, we determine whether there was substantial evidence to support the administrative decision. *See id.* at 387, 807 P.2d at 1123. We review *de novo* any questions of law involved in the administrative proceedings. *See id.*

### B. Review of Grazing Lease Denial

¶ 12 In 1910, the United States Congress passed the Arizona–New Mexico Enabling Act ("the Enabling Act"), which authorized citizens of the territories of Arizona and New Mexico to form state governments. *See Kadish v. Arizona State Land Dep't,* 155 Ariz. 484, 486, 747 P.2d 1183, 1185 (1987), *aff'd, ASARCO, Inc. v. Kadish,* 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). Under the Enabling Act, the United States granted almost ten million acres of land to Arizona; this land could be used only for the support of the common schools of the state (school trust lands) and for internal improvements to the state. *See id.* Voters in Arizona accepted the land grants by ratifying article 10, section 1 of the Arizona Constitution. *See id.*

¶ 13 The Enabling Act is one of the fundamental laws of Arizona and is superior to our state constitution. *See Gladden Farms, Inc. v. State,* 129 Ariz. 516, 518, 633 P.2d 325, 327 (1981) (citing *Murphy v. State,* 65 Ariz. 338, 181 P.2d 336 (1947)). Thus, neither the Arizona Constitution nor laws may conflict with the Enabling Act or alter or amend the trust provisions in it without congressional approval. *See id.; Kadish,* 155 Ariz. at 486, 747 P.2d at 1185.

¶ 14 Section 28 of the Enabling Act requires Arizona to hold the lands in trust for the beneficiaries and specifies that the property can be disposed of only as authorized in the Act. This section further provides that the trust lands may not be sold or leased "except to the highest and best bidder at a public auction" after notice by advertisement. However, pursuant to a 1936 act of Congress, the legislature may prescribe procedures for leases of ten years or less. *See Kadish,* 155 Ariz. at 491, 747 P.2d at 1190, *citing* Act of June 5, 1936, Pub.L. No. 658 (ch. 517), 49 Stat. 1477. The 1936 act "gives the legislature power to regulate the overall manner of the making of the lease, and the general terms of the lease, so long as there is substantial conformity to the restrictions of § 28." *Id.*

¶ 15 Given the restrictions on dealing with school trust lands, it is clear that "[t]he duties imposed upon the state were the duties of a trustee and not simply the duties of a good manager." *Id; see also State ex rel. Ebke v. Bd. of Educ. Lands and Funds,* 154 Neb. 244, 154 Neb. 596, 47 N.W.2d 520, 525 (1951); *County of Skamania v. State,* 102 Wash.2d 127, 685 P.2d 576, 580 (1984). Among the fiduciary duties of a trustee is the obligation to obtain the highest possible return for the benefit of the trust:

> A trustee is required to dispose of trust property upon the most advantageous terms which it is possible for him to secure for the benefit of the cestui que trust whom he represents. The rule is no different in the leasing of property of a trust estate. A trustee is required to accept the highest bid in the absence of cogent reasons for not so doing.

*Ebke,* 47 N.W.2d at 523; *see also Lassen v. Arizona Highway Dep't,* 385 U.S. 458, 467, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967) (Enabling Act restrictions show Congress' intent that the land grants provide the most substantial support possible to the beneficiaries and that only the beneficiaries profit from the trust). As the state agency charged with administering all laws relating to lands owned by and under the control of the state, the Department and its Commissioner must exercise the fiduciary duty imposed by the Enabling Act. *See A.R.S. §§ 37–102, 37–132(A).*

¶ 16 Mindful of this law, appellants argue that the Department has violated its fiduciary duty by denying their offers to

lease the Coconino, Santa Cruz, and Pinal County lands. They assert that their offers would not only provide more income for the trust than the minimum grazing rental being collected, but would also increase the forage capacity of the lands to produce a greater return to the trust once the lands were returned to grazing. Appellants note that the Department rejected their lease applications because approving them would prevent the Department from obtaining an even higher rental fee that might be collected if the lands were reclassified to commercial use; they argue that this decision has resulted in less revenue to the trust rather than more.

¶ 17 Appellees respond that the Commissioner did not abuse his discretion in denying appellants' applications for grazing leases because, under Arizona statutes, he may not issue a grazing lease to a party who does not intend to use the leased land for grazing. They argue that this prohibition is part of a statutory scheme that governs leases of Arizona trust land and is consistent with the Enabling Act in that it requires lessees to pay rental rates that are consistent with the appraised value of the land under the classification that reflects the highest and best use of the land.

¶ 18 The legislature has directed the Commissioner to classify and appraise all state lands for the purpose of leasing. A.R.S. § 37–132(A)(5). The classifications of lands listed in A.R.S. section 37–212 include "lands suitable for grazing purposes" and "lands suitable for commercial purposes." A.R.S. § 37–212(B)(2) and (4). "Grazing lands" are statutorily defined as "lands which can be used only for the ranging of livestock." A.R.S. § 37–101(7). " 'Commercial lands' means lands which can be used principally for business, institutional, religious, charitable, governmental or recreational purposes, or any general purpose other than agricultural, grazing, mining, oil, homesite or rights-of-way." A.R.S. § 37–101(3).

■ ¶ 19 State lands are subject to lease for grazing purposes without public auction if the term is not more than ten years. A.R.S. § 37–281.01(A). Such leases are granted un-

der the Arizona constitution and laws and the rules of the Department. *Id.* Pursuant to these laws and rules, the lessee must use the leased land for the purpose for which the land is leased. A.R.S. § 37–281(D). Pursuant to A.A.C. R12–5–502:

> All state lands ... shall be classified by the Commissioner prior to the lease thereof and shall be leased only under the classification fixed by the Commissioner, unless such land is reclassified as provided by law. The Commissioner shall have the power to reclassify such lands from time to time when he deems such reclassification to be for the best interests of the state, and all leases and permits shall be subject to such reclassification.

*See also* A.R.S. § 37–212(C) (Commissioner may reclassify lands if he determines that reclassification is in the best interest of the trust and of the state). Any person who wishes to have any state land reclassified must apply to the Commissioner and submit an application to lease the lands for the reclassified purpose. A.A.C. R12–5–530. The Commissioner's discretion to reclassify lands will not be disturbed absent an abuse of discretion. *See Havasu Heights Ranch & Dev. Corp. v. State Land Dep't,* 158 Ariz. 552, 557, 764 P.2d 37, 42 (App.1988).

¶ 20 In light of this statutory scheme, we conclude that the Department was justified in rejecting appellants' applications to lease grazing land for nongrazing purposes. As noted above, the legislature has defined "grazing lands" as "lands which can be used only for the ranging of livestock." A.R.S. § 37–101(7). Because of this limitation on the use of grazing lands, acquisition of a grazing lease with the intent to prevent grazing in order to promote conservation and restoration is not permitted.

¶ 21 The issuance of a lease for conservation use is not precluded under the relevant statutes; the statutes preclude only the issuance of a grazing lease for conservation or recreation purposes. The legislature has provided categories for leases other than grazing; conservation and recreational use as proposed by appellants fall within the commercial classification.[3]

---

**3.** Under A.R.S. section 37–212(B)(10), trust lands may be classified as suitable for conservation purposes. However, pursuant to A.R.S. section 37–312(A) and (B), the conservation classification is reserved primarily for parcels near urban areas.

¶ 22 Applying federal law, the court in *Public Lands Council v. Babbitt,* 154 F.3d 1160 (10th Cir.1998), reached a similar conclusion. There, the United States Interior Secretary allowed the issuance of ten-year permits to use public lands for conservation purposes to the exclusion of livestock grazing. Pursuant to 43 U.S.C. section 315b, the Secretary was authorized "to issue or cause to be issued permits to graze livestock" on public lands. In regulations adopted in 1995, the Secretary authorized the issuance of grazing permits or leases for "livestock grazing, suspended use, and conservation use." 43 C.F.R. § 4130.2(a) (1995). The effect of the regulation was that a grazing permit could be issued to an individual or group that would not graze livestock for the entire duration of a permit. *Id.* at 1180.

¶ 23 The issue posed to the court was whether the Secretary had the authority to issue a grazing permit that excluded livestock grazing for the entire term of the permit. *See id.* at 1181. The court held that he did not have such authority. *Id.* It noted that 43 U.S.C. section 315b does not authorize permits for any type of use other than grazing on lands in the grazing districts. The court found that neither that statute nor two other similar statutes at 43 U.S.C. sections 1702(p) and 1902(c) authorized permits intended exclusively for conservation use. It rejected as "simply untenable" the Secretary's assertion that grazing permits for use of land in grazing districts need not involve an intent to graze livestock. *Id.* In summary, the court stated that Congress intended that once the Secretary established a grazing district under the statute, the primary use of that land should be grazing and could be changed only if the Secretary withdrew the land from grazing use in accordance with statutory withdrawal provisions. *Id.* We agree with this reasoning and apply it to the issue before us.[4]

■■■ ¶ 24 Appellants argue that the Commissioner may authorize their intended conservation use under A.R.S. section 37–285(H), which provides:

The department may authorize non-use for part or all of the grazing use upon request of the lessee at least sixty days prior to the beginning of the billing date. The rental fee shall be based on the animal unit months use, but the total rental fee for partial or full non-use shall not be less than five cents per acre per annum.

The Department takes the position that this provision applies only to the request of a lessee who has been grazing livestock and cannot be construed to allow appellants to obtain a grazing lease for a nongrazing purpose.

¶ 25 We agree with the Department's interpretation of A.R.S. section 37–285(H). By referring to non-use of the grazing use, the statute assumes that the lessee has been using the land for grazing. At the administrative hearing, a Department official testified that non-use is a temporary measure that is only permitted during the lease term upon the lessees' request and explanation for the request; generally, a condition such as a drought would justify non-use. In addition, the language of the statute allows an application for non-use to be filed prior to the annual billing date, not when applying for a new lease for non-use that would apply to the entire term of the lease.

■■■ ¶ 26 Appellants also requested that the Department rely on A.A.C. R12–5–705(O) to grant them permission to lease grazing land for conservation and recreation purposes. This rule provides that "[n]o lessee or permittee shall use lands under lease or permit to him except for grazing purposes unless authorized by the Commissioner in writing." The rule also requires that "[a]pplications for a special use of lands under permit or lease to a lessee or permittee for purposes other than grazing shall be made in writing ... and shall state in detail the reasons for such use."

¶ 27 This rule appears to contemplate that applications for special use of lands may be filed by lessees who have already acquired a

---

4. The dissent attempts to distinguish *Babbitt* on the basis that the federal government was not a trustee in that case, with the attendant fiduciary duties that are imposed in this case by the trust. However, this case does not involve the question whether a fiduciary duty to the trust was breached by a discretionary decision; rather, it involves only a narrow determination by the Commissioner that he had no legal authority to issue a grazing lease for a nongrazing purpose.

grazing lease and have used the land for grazing. In any event, however, the rule should be interpreted to allow only special uses that are consistent with a grazing lease under A.R.S. section 37–285(H). It would be inconsistent with the statutory scheme for leases of public trust lands to allow the Commissioner to undermine the classification system by allowing grazing land to be used for purposes that fall within a higher classification.

¶ 28 Appellants' proposed use of the lands falls within the commercial classification, because "recreational purposes" is stated as a use of commercial lands and conservation purposes fall within uses for either charitable or "any other general purpose other than agricultural, grazing, mining, oil, homesite or rights-of-way." A.R.S. § 37–101(3). The Department advised appellants to pursue commercial leases but they declined to do so. John Horning, representing Forest Guardians, testified at the administrative hearing that Forest Guardians was interested in a grazing lease and was not interested in reclassification to commercial or anything else. He indicated that Forest Guardians was not engaged in commercial activity and was not interested in paying commercial lease rates. Forest Guardians was concerned that a commercial lease would have rates that were more than it could pay. No evidence of what a commercial lease rate would be for these parcels was presented.

¶ 29 We conclude that the reclassification provisions further the goals of the Enabling Act and benefit the school lands trust; therefore, applicants for leases must adhere to those provisions. Appellants' belief that a commercial lease rate would be considerably more than they had offered for the leases and more than they could afford is mere speculation. Only after an application for reclassification and appraisal would they know the rate to be charged. Appellants unreasonably sought to limit the rental amount by insisting on a grazing lease with its low rental rate, even though appellants offered to pay more than the minimum rate.

¶ 30 If the Commissioner had accepted appellants' offers, he would have given them the benefit of grazing appraisals without any appraisal for the actual intended conservation and recreation uses. As stated by the ALJ, "the value of [appellants'] proposed conservation and recreational uses cannot properly be established solely by an offer to pay more than the estimate of forage usage, which is the basis for annual grazing lease rentals." The Enabling Act requires appraisal of the leased lands. If nongrazing uses are treated as grazing uses, leases potentially could be obtained for less than the fair market value of the actual use of the leased lands. This result would be detrimental to the trust. If in fact the land is suitable for a use that is defined by statute as commercial, the trust is entitled to benefit from the increased value of the land.

¶ 31 Appellants assert that the commissioner's obligation to achieve the "highest and best use" of these lands required acceptance of the applications because appellants have offered more money than other applicants and have offered to rest the land. Thus, appellants contend that, because the applications were rejected, "the state violates its fiduciary duty to the trust to maximize both revenue and land welfare." The dissent agrees with this assertion.

¶ 32 The factual record before us on appeal simply does not support this legal conclusion. The condition of these lands was neither litigated nor adjudicated. Other than a reference to a small portion of the land having been overgrazed to a "moonscape" condition, the record before this court simply does not contain evidentiary support to reach a legal conclusion that nongrazing constitutes the "best use" of the land at this point. Nor was this factual determination made by the Department, which has the authority to classify those "lands suitable for grazing purposes," see A.R.S. section 37–212(B)(2), to authorize "non-use" by a lessee, see A.R.S. section 37–285(H), and the discretion to reclassify lands to commercial purposes when in the best interest of the trust and the state, see A.R.S. section 37–212(C). Rather, the issue below did not require a discretionary decision based on a factual determination of environmental conditions, but involved only a legal question whether the statutory scheme provided authority for the Department to issue the type of leases for which appellants applied. Therefore, on this record, the "best use" of

the land cannot be determined, nor was it relevant at this juncture, given the limited legal issues presented in these proceedings.

¶ 33 Additionally, the "highest use" of the land, in terms of economic revenue, cannot be ascertained from this record. Although appellants argue that they offered to pay a rental rate higher than that of any other current grazing applicant, they conceded at oral argument they did not know what the commercial lease rate would be because neither an application to reclassify nor an appraisal to determine such a rate has been pursued in this case. Whether they cannot "afford" the commercial rate—another factual issue that cannot be determined from this record—is simply irrelevant. Therefore, it is speculative at the very least to conclude that these applicants provided the greatest potential revenue from the use of these lands to the trust. Furthermore, as we have recently pointed out, "maximizing short-term lease income is not the Department's only concern" when deciding how to serve the best interests of the trust. *Jeffries v. Hassell,* 310 Ariz. Adv. Rep. 3, ¶ 10, 197 Ariz. 151, ¶ 10, 3 P.3d 1071, ¶ 10 (App.1999). Thus, the "highest bidder" is not necessarily granted a lease to state trust lands.

¶ 34 Appellants argue that, due to the Commissioner's statutory and fiduciary duties, he should have initiated reclassification of the lands if it would have resulted in increased revenues to the trust. Appellees respond that the failure of the Commissioner to consider reclassification is not an appealable agency decision. The trial court apparently considered appellants' argument and we do so as well inasmuch as the ALJ concluded that the Commissioner did not breach his statutory and fiduciary duties by not reclassifying the tracts to commercial lands because appellants had indicated that they would not accept a commercial lease.

¶ 35 As noted above, the Commissioner's decision regarding reclassifying leased lands will not be disturbed absent an abuse of discretion. The evidence in this case supports the conclusion that the Commissioner did not abuse his discretion in failing to reclassify the parcels sought by appellants. Appellants refused to apply for such a reclassification and no evidence was presented on this issue. Although they claim they never stated they would not accept a commercial lease, substantial evidence, both in writing and recorded testimony, supports the ALJ's finding that they had indicated that they would not accept a commercial lease. It is reasonable to interpret those statements to mean that they would not accept a commercial lease even if the Commissioner chose to reclassify the property to accommodate their intended uses. Therefore, the Commissioner did not abuse his discretion in not initiating reclassification.

## C. Response to the Dissent

¶ 36 Although our above analysis addresses most of the issues raised by the dissent, we nevertheless believe a short response to the dissent's concerns is warranted.

¶ 37 The dissent reaches a different conclusion based on two premises that we find unsupported by the record in this appeal. First, the dissent assumes that, because these applicants offered the most money for these grazing leases, they became the "highest and best bidder" and the Department was required to accept their lease applications. Second, the dissent assumes that the applicants' intent to "rest" the land from grazing "serves the best interest of the trust land," and thus constitutes the "highest and best use" of the land.

¶ 38 The dissent concedes that the Department has discretion to find that the highest monetary bid on a particular lease is not necessarily the "highest and best" bid. *See Jeffries v. Hassell,* 310 Ariz. Adv. Rep. 3, ¶ 10, 197 Ariz. 151, ¶ 10, 3 P.3d 1071, ¶ 10 (App.1999); *Havasu Heights Ranch & Dev. Corp. v. Desert Valley Wood Products,* 167 Ariz. 383, 392, 807 P.2d 1119, 1128 (App. 1990). In this case we believe that the Department did just that, by recommending that the applicants apply for reclassification of these lands from grazing to commercial. Grazing lands are statutorily defined as "lands which can be used *only* for the ranging of livestock." A.R.S. § 37–212(B)(2) (emphasis added). Appellants' applications proposed both recreational and environmental uses that do not involve the ranging of livestock. If the land can be utilized for those

purposes, and if those purposes would benefit the trust, then those purposes would no longer be classified as grazing lands leased at the grazing appraisal rates. The "highest and best" bid under those circumstances, in terms of monetary benefit to the trust, presumably would be a bid for a reclassified commercial lease.

¶ 39 Implicit in the dissent's reasoning, however, is the fear that if these lands were reclassified as commercial, appellants would be forced into competition with other potential commercial lessees, such as shopping malls. Thus, the dissent speculates that a conservationist who protects the land without generating income must compete for a lease with a business owner who uses the land in a damaging way to generate income. However, no evidence exists on this record that any "business owner" is interested in leasing these lands or that any particular commercial use would damage these lands.

¶ 40 Additionally, this analysis overlooks the fact that, because these lands are currently classified as grazing lands, by definition they are *not* currently suitable for shopping malls or other business uses; indeed, if they were, they would not be classified as grazing lands.[5] Viewed another way, if these lands are now, for some reason, suitable for commercial purposes that would benefit the trust, including shopping malls, then they should be leased at rates that reflect this new "highest and best use." Again we point out that the potential inability of these particular applicants to "afford" a commercial lease—the amount of which cannot be ascertained from this record—is of absolutely no consequence in any determination by the Department about what type of lease arrangement best benefits the trust.

¶ 41 The applicants' assertion that some of the trust land had become a "moonscape" because "livestock [have] removed basically all the plant material" was nothing more than a mere assertion by the applicant in these proceedings, and was unsupported by any expert evidence.

■ ·¶ 42 The dissent contends that appellants "*did* present evidence that some of the trust land has become a 'moonscape' from overgrazing." At the administrative hearing, Forest Guardians offered the testimony of one of their directors, John Horning, who had visited and photographed a small area of the 161 acre parcel, and who had observed twelve cows grazing two months during the year. He described the photograph, admitted as Exhibit 1, as "looking due south along the eastern boundary of the grazing lease in question," and stated that it depicted the following:

> Well, on the right side of the fence line there, which is the state land in question, ah, livestock had removed basically all the plant material, ah, sort of looks like a moonscape on the right side. And on the left side there is private land and I do not know the grazing history of that land or any of the other history of that land, but it definitely provides a visual contrast that's pretty distinct from, ah, what was going on on the right side of the fence there.

The photocopy of the photograph in the record is undecipherable and provides no evidentiary support. No expert testimony was presented to establish the condition of the soil, the plant material, weather conditions, or the effect of grazing on the land, nor was Horning established as qualified to opine on any scientific knowledge based on his experi-

5. We do not find adequate support in the record for the dissent's assertion that the Department has previously granted grazing leases to applicants who do not intend to use the land for grazing purposes.

The record indicates that at the time the Department granted a grazing lease to the Buenos Aires National Wildlife Refuge, an experimental grazing program was contemplated at the refuge; thus, grazing was an intended use. When a subsequent decision was made that the livestock would not be grazed on the refuge, the Department worked with the refuge on reclassifying that land as commercial. Apparently, while the reclassification was in progress, the federal government acquired the state trust lands on which the refuge was situated.

The dissent's second example, The Raymond Buffalo Ranch, involved a grazing lease for grazing purposes, but apparently buffalo were not included in the statutory definition of "range animals." The Department's Range Section Manager who testified to these facts also stated that this was the only situation in his fourteen years of experience that involved a grazing lease with no cattle grazing on the land.

These isolated incidents hardly reflect a practice by the Department of leasing grazing lands to non-grazing applicants.

ence, training, or education. *See generally* Rule 702, Arizona Rules of Evidence. We conclude that Horning's lay opinion characterizing the condition of a small parcel of the land, without establishing any expertise to make that characterization, did not constitute any evidentiary support on which to base an opinion, on this record, whether nongrazing constitutes the "best use" of the land at this time. *See generally* Rule 701, Arizona Rules of Evidence.

¶ 43 The "moonscape" characterization was again referred to in closing argument by appellants' counsel:

> Who knows, ah, but the moonscape that you've seen, as, ah, in the photograph in the exhibit is, I'm hard-pressed to understand why the state won't take more money to help improve that situation, restore this property, restore this habitat, it is completely and totally incongruous, Your Honor, and it is a violation of the state's duty as trustee of this property.

In response, counsel for the Department commented:

> [I]t's not a question of is grazing better or is it not better. The moonscape is irrelevant. If you want to conduct that use, we're not here today to say yeah [sic] or nay to that use. We're here to say file the appropriate application and stop trying to get it for a grazing rate and let us appraise it and let us classify the land and let us go through the procedures.

¶ 44 As we have pointed out, the determination when to "rest" the land because of ecological conditions is one within the discretion of the Department pursuant to A.R.S. section 37–285(H); we have found no authority for the premise that the Department has to accept the assertion of a non-grazing lease applicant that the land needs "resting." On this record, we cannot reach the legal conclusion that non-grazing on this particular land at this particular time serves the best interest of the trust, or that it was a breach of fiduciary duty for the Department to refuse to "rest" the land.

¶ 45 The dissent's premise is that these applicants, because of their stated environmental concerns, should be given preferential treatment to be allowed to lease grazing land at grazing lease rates for non-grazing purposes. We cannot find support for this "preferential attitude" either in the Enabling Act or in the statutory scheme any more than we would find support there for the "nostalgia and myth of pioneer history." Furthermore, the dissent's concern about the "fickle" nature of how the current statutory system addresses environmental concerns in rural and urban areas is not at issue in the context of this appeal and is best addressed to the legislature.

**CONCLUSION**

¶ 46 In summary, we conclude that the Commissioner did not abuse his discretion, act illegally, or breach his fiduciary duty to the school lands trust when he denied appellants' grazing lease applications. In addition, we find that the statutory scheme for leasing of grazing lands and reclassification of leased lands is consistent with the Enabling Act and is designed to realize the greatest benefits possible to the trust when an applicant wishes to use grazing land for a purpose other than grazing and ranging livestock. Accordingly, we affirm the trial court judgment that affirmed the administrative decision.

CONCURRING: JEFFERSON L. LANKFORD, Judge.

GERBER, Judge, Dissenting.

¶ 47 I respectfully disagree with the majority. In my view, the Department's rejection of the appellants' grazing lease applications frustrated the Enabling Act's mandate that trust land leases go only to the "highest and best bidder." *See Lassen*, 385 U.S. at 461–62, 87 S.Ct. 584 (Enabling Act restrictions are "few and simple," referring to the highest and best bidder requirement).

¶ 48 Who is the "highest and best bidder" continues to be a two-part inquiry. *See Keith v. Johnson*, 109 Ky. 421, 59 S.W. 487, 488 (1900) ("force is to be given to both the controlling words 'highest' and 'best' " when interpreting the phrase "highest and best bidder"). The "highest" bidder offers the most money. *See Brown v. City of Phoenix*, 77 Ariz. 368, 375, 272 P.2d 358, 363 (1954). Here, the appellants, who bid two and five times as much as their competitors, were clearly the highest monetary bidders.

¶ 49 The "best" prong requires the Department to determine which lessee would best serve pecuniary and non-pecuniary interests, which include the welfare of the land itself. *See Havasu Heights Ranch & Dev. Corp. v. Desert Valley Wood Products*, 167 Ariz. 383, 392, 807 P.2d 1119, 1128 (App.1990) (maximizing revenue is not the sole consideration for leases). If the highest monetary bid does not serve the interests of the trust, the Department should accept the next highest bid that does.

¶ 50 Appellants' applications more than satisfied the highest and best bidder requirement. The monetary advantage of their bids is undisputed. As to the "best interests," our own court has noted that "factors such as . . . environmental considerations may be significant." *Jeffries v. Hassell*, 310 Ariz. Adv. Rep. 3, 5 n. 1, 197 Ariz. 151, 154 n. 1, 3 P.3d 1071, 1074 n. 1 (App.1999). Ceasing further damage to the land's resources, coupled with their regeneration, serves the best interests of the trust because resting overgrazed land restores its value.

¶ 51 The majority faults the appellants for not presenting enough evidence that these lands are in such an ecological state that non-grazing serves their best interests. Appellants *did* present evidence that some of the trust land has become a "moonscape" from overgrazing. No more evidence need buttress the observation that land already damaged by grazing will continue to suffer from further grazing. Furthermore, a bidder has no responsibility to demonstrate that its bid serves the best interests of the trust. Rather, the department, as trustee, must show that the best interests of the trust require preferring a particular bid over another, especially where, as here, the Department chose a lower monetary bid over a higher

one. *See Brown*, 77 Ariz. at 375, 272 P.2d at 363 (one entrusted with the disposition of public property may award a lease to a less favorable bidder only after due investigation of the underlying facts and exercising a reasonable, honest, and prudent discretion).

¶ 52 On this record, the Department seems to care little about its fiduciary responsibility. It did not inspect or evaluate the conditions of these lands before denying appellants' applications. It even argued that it was "irrelevant" that overgrazing had rendered some of its land a "moonscape," surprising insensitivity for a trustee. Moreover, instead of granting these more beneficial applications, the Department renewed the former lessees' leases, thereby allowing the very lessees whose cattle helped "moonscape" the land to continue doing so for another ten years. Renewing these prior leases cannot be reconciled with the department's obligation to honor range stewardship. *See Jeffries*, 310 Ariz. Adv. Rep. at 4, ¶ 11, 197 Ariz. at 154, ¶ 11, 3 P.3d at 1074, ¶ 11.

¶ 53 To the Department, granting grazing leases for lands which will not be grazed violates A.R.S. section 37–281(D) and A.A.C. R12–5–502. The Department accordingly required appellants to apply for a more costly "commercial" lease, thereby squelching any beneficial competition for grazing leases.[6]

¶ 54 Implicit in the majority's reasoning is the premise that "non-grazing" conflicts with "grazing," a counterintuitive assumption unsupported in the Enabling Act. This same Department routinely allows ranchers to use their grazing leases for non-grazing purposes, sometimes for the entire duration of a grazing lease, without exacting commercial reclassification or commercial lease rates. It denies similar opportunities to conservationists.[7] Under the current system, the identi-

---

6. As the majority points out, the record currently before the court contains no evidence regarding the actual price that the department would have charged appellants for a commercial lease of the lands in question here. Nevertheless, common sense dictates that, in practice, the commercial lease rate for any given parcel of state trust land will always be substantially higher than the grazing lease rate for the same parcel. The reclassification requirement therefore stifles market competition for grazing leases by pricing conservationists out of the lease market and allowing existing rancher lessees to bid the bare minimum

rental rate for their grazing leases. Given that the grazing lease uses proposed by appellants here are not inconsistent with those the department currently approves for existing grazing land lessees, it is difficult to see how the trust benefits by pricing conservationists out of the grazing lease market just because they will not stock their leased lands with livestock.

7. The record shows that the Department granted grazing leases on at least two occasions to applicants who did not intend to use the land for grazing purposes. The U.S. Fish and Wildlife

ties of the applicant rather than the quality of the offer determine who gets a lease. The Department issues grazing leases to a rancher who can then immediately receive non-grazing permission for part or all of the lease duration. But it views a conservationist who wishes to rest the land at the lease inception as an impermissible non-grazer who, unlike the rancher, must request a more expensive "commercial" permit to rest tired land. The proposed uses for the land remain the same in both scenarios; only the applicants' identities differ.

¶ 55 The majority finds comfort in *Public Lands Council v. Babbitt,* which does not address two elements in the present case. First, A.R.S. section 37–285(H), unlike the federal statutes at issue in *Babbitt,* expressly allows the department to "authorize non-use for part or all of a grazing use."[8] Second, *Babbitt* involves neither our Enabling Act nor the fiduciary obligation of trusteeship, a higher stewardship than binds the Department of the Interior. Whether these applications violate statutes is a decidedly secondary consideration because the Enabling Act trumps all state statutes and internal departmental practices. Statutory fidelity must yield to fidelity to the Enabling Act. *See Kadish,* 155 Ariz. at 486, 747 P.2d at 1185 (federal law is supreme).

¶ 56 The Department fears that if non-grazing were treated as grazing, the land would not be correctly appraised. But the Department let 90 non-grazing ranchers gain a benefit of the bargain by charging them grazing rental rates for non-grazing instead of the commercial rate. Appraisals imper-

fectly approximate fair market value; bids show true fair market value. *See Ebke,* 47 N.W.2d 520, 523 (appraised value of public land "is only an arbitrary method of fixing that value when there is no bid ...").

¶ 57 The Department's urging these appellants to apply for a more expensive commercial lease thrust them into a category as arbitrary as its grazing policies. Commercial lands are "used principally for business, institutional, religious, charitable, governmental or recreational purposes, or any general purpose other than agricultural, grazing, mining, oil, homesite or rights-of-way." A.R.S. § 37–101(3) (Supp.1999).[9] A "commercial lease" thus includes both revenue and non-revenue generating uses, a dichotomy producing discriminatory inconsistencies. A commercial lease holder could build a lucrative shopping mall under the same lease required of a conservationist who seeks to rejuvenate the land without generating any income at all. Because the Department does not distinguish between revenue and non-revenue "commercial" uses, it penalizes non-revenue uses which, as here, can better the land more than revenue-generating uses.

¶ 58 The Department seemingly fears loss of control over its leases by awarding them to groups like appellants. But allowing these appellants to rest the land for ten years under a grazing lease does not perpetually exclude ranchers. Nor would it result in trust lands being used inconsistently with current grazing use. At the end of their lease terms, appellants desiring to renew would compete with other applicants, possi-

Service ("Fish & Wildlife") created a wildlife refuge on the land, and Raymond Buffalo Ranch grazed buffalo, not a range animal defined by the Department's statutes and rules. The Department worked with both these applicants to change the category. Here the Department did not negotiate with the appellants at all but summarily denied their applications. The Department routinely grants permission to existing holders of grazing leases to rest all or part of the land, a permission also denied these applicants.

8. The *Babbitt* court found that the Secretary could not promulgate a regulation allowing grazing permits to be issued for "conservation use" specifically because there was no language allowing a grazing permit to be issued for a purpose other then grazing in the controlling statutes. *See Babbitt,* 154 F.3d 1160, 1181 (referring to the

plain language of the Taylor Grazing Act, Federal Land Policy and Management Act, and the Public Rangelands Improvement Act).

9. At least one appellant here (Forest Guardians) expressed a desire to secure a grazing lease, in part, for "recreational purposes." Arizona's statutes do not define what "recreational purposes" are. But whatever "recreational purposes" may mean, the appellant's bare desire to use his grazing lease land for such purposes was clearly not the primary reason for appellant's attempt to secure a grazing lease. This desire hardly is sufficient to require appellant to apply for a commercial lease by operation of A.R.S. § 37–101(3). It would be an entirely different matter if it appeared that appellant was trying to obtain a grazing lease for a revenue-rich commercial campground or a ski resort.

bly ranchers, when further resting may well be less compelling because grazing may then be the highest and best use of the recovered land. Granting appellants' non-use permits now hardly ties the Department's hands in assessing future applications.

¶ 59 These considerations, coupled with the Department's professed "irrelevancy" toward its uninspected, moonscaped land, raise economic considerations. The Department's overbroad, higher priced commercial lease—required even for non-remunerative land resting—is predatory pricing forcing conservationists like these appellants not only out of the lease market but also out of the market pool protecting the land. Value maximizing land policy also suffers: lessee ranchers can ignore the costs they impose on other users and on the land itself when they "moonscape" instead of practicing sustainable range stewardship. Overgrazing both reduces cattle weights and hurts the land's future utility. Moonscaping becomes truly "irrelevant" when the only incentive is to exhaust present resources of grass and water:

> Government ownership of natural resources looks a lot like poorly defined property rights—everyone owns the national forests, so no one owns them.... Government managers do not have the incentive to maximize the value of the forest and ... are particularly susceptible to political meddling.

H. Butler, ECONOMIC ANALYSIS FOR LAWYERS 423 (1999). G. Hardin's description of the "tragedy" of public stewardship matches the "irrelevancy" of the land condition. *See* G. Hardin, *The Tragedy of the Commons,* 162 Science 1243, 1244–45 (1968); Butler, *supra* at 423.

¶ 60 Nothing in the Enabling Act prefers grazing over conservation or ranchers over conservationists. The nostalgia and myth of pioneer history are irrelevant. *See County of Skamania v. State,* 102 Wash.2d 127, 685 P.2d 576, 580 (1984). Appellants' willingness both to pay more money and to rest depleted land would maximize trust revenues and preserve trust assets for both short- and long-term uses. The Department's devotion to its internal policies and statutes frustrates its primary fealty to the Enabling Act. A court which respected the Enabling Act's prece-

dence over lesser laws would order the Department to issue the leases in question.