34 P.3d 364

Forest GUARDIANS, and Jonathan D. Tate, Plaintiffs–Appellants,

v.

J. Dennis WELLS, in his official capacity as Commissioner of the Arizona State Land Department and the Arizona State Land Department, Defendants–Appellees.

No. CV–00–0177–PR.

Supreme Court of Arizona, En Banc.

Nov. 21, 2001.

Arizona Center for Law in the Public Interest, by Timothy M. Hogan, Jennifer B. Anderson, Phoenix, Attorneys for Plaintiffs–Appellants.

Janet A. Napolitano, Arizona Attorney General, by Theresa M. Craig, Assistant Attorney General, Attorneys for Defendants–Appellees.

Arizona Education Association, by Susan G. Sendrow, Phoenix, Attorneys for Amicus Curiae Arizona Education Association.

## OPINION

FELDMAN, Justice.

¶ 1 The State Land Commissioner (Commissioner) denied the applications of Forest Guardians and Jonathan Tate (collectively Plaintiffs), who were the highest bidders for grazing leases on three parcels of land that are part of the state's school land trust, which is administered by the State Land Department (Department). That denial was premised on the conclusion that the statutory scheme did not permit the issuance of grazing leases for the purpose of restoring the land. The trial court affirmed on review of the agency decision, as did the court of appeals. We granted review and now vacate the court of appeals' opinion and reverse the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶ 2 In 1910, Congress passed the Arizona New Mexico Enabling Act (the Enabling Act), which authorized the citizens of the Arizona and New Mexico territories to form state governments. *See* Act of June 20, 1910, Pub.L. 219 (ch. 310), 36 Stat. 557. By that act, the United States granted the future state of Arizona approximately ten million acres of land to be held in trust and to be used only for the support of the common schools of the state (school trust lands). *See*

Enabling Act § 28. The Department, under the supervision of the Commissioner, an officer appointed by the governor and confirmed by the legislature, administers the school trust lands for the state. *See* A.R.S. §§ 37–102, 37–132.[1]

¶ 3 In 1997, Forest Guardians applied for a ten-year lease on approximately 5,000 acres of school trust grazing land in Coconino County. The then-current lessee also ap-plied to renew its lease to graze eighty-five head of cattle on the land for $2,150 per year. Forest Guardians' offer was approximately twice that amount. Forest Guardians also applied for a ten-year lease of approximately 162 acres of land in Santa Cruz County. That land had also been previously leased, and the lessee had applied for renewal at $50.16 per year. Forest Guardians offered to pay five times that amount. Jonathan Tate applied for a ten-year lease on approximately 16,000 acres of trust land in Pinal County, offering to pay twice the amount the then-current lessee offered for renewal of its lease.

¶ 4 Though the Commissioner had classified all the parcels of land at issue as grazing land, Plaintiffs did not intend to graze livestock on any of the parcels in question. Instead, they informed the Commissioner, Forest Guardians by cover letter and Tate in his application, that the land would be rested for the entire term of the ten-year leases. Thus, Forest Guardians requested that the Commissioner permit Forest Guardians to use the land "for purposes other than domestic livestock grazing, as is permitted by [Department regulations]." Forest Guardians' letter explained that non-use for the ten-year term would restore the properties, thus allowing grazing in the future and enhancing the corpus of the trust, while its higher bids would satisfy the Commissioner's other legal obligation to obtain the highest revenue for the school trust lands. Throughout a subsequent administrative proceeding, Plaintiffs argued that by "not stocking the land[, Plaintiffs] will increase [its] value ... to conservationists, prospective livestock interests and trust

---

1. Unless otherwise stated, all references to A.R.S. Title 37 are to the statutes as they existed at the time of Plaintiffs' lease applications.

beneficiaries." *See* Recommended Decision of Administrative Law Judge (ALJ Decision), Findings of Fact, at ¶ 18 (March 9, 1998) (No. 97F–032–LAN).

¶ 5 The Department notified Plaintiffs that their applications would be rejected because they did not propose to use the land for grazing—the purpose for which it had been classified. It informed Plaintiffs that they would have to file an application to have the lands reclassified for commercial rather than grazing use if they wished to lease trust land for preservation or restoration. Plaintiffs responded that they would neither withdraw their applications nor submit applications for reclassification and issuance of commercial leases. They continued to request the Commissioner to accept their bids and issue leases for resting or non-use of the grazing lands. *Id.* at ¶¶ 19–21. The Commissioner eventually denied Plaintiffs' lease applications "on the basis" that Plaintiffs "did not intend to range livestock" and asserted that, under the Commission's rules, such non-use would be consistent only with commercial leasing. *Id.* at ¶ 22. Plaintiffs, however, were unwilling to apply for commercial leases, explaining that they were not willing to pay the higher fees that would be required for commercial leases and rentals. *Id.* at ¶ 30. According to the Department, Plaintiffs' failure to apply for reclassification for commercial uses would prevent the trust from receiving additional lease income based on the higher, commercial use standard and thus was "not in the best interests of the State Trust." Denial of Application, ¶¶ 3d (No. 146–97/98) and 3 (No. 147–97/98) (October 10, 1997). Accordingly, Plaintiffs' applications were denied.

¶ 6 On Plaintiffs' appeal from the denial, the administrative law judge (ALJ) concluded that the Commissioner did not violate his fiduciary duty by rejecting Plaintiffs' applications because Plaintiffs' intended restorative use of the land did not meet the Department's criteria for a grazing lease and because Plaintiffs declined to apply for issuance of commercial leases. ALJ Decision, Conclusions of Law, ¶ 8. By order, the Commissioner adopted the ALJ's recommended decision.

*See* Decision and Order (April 1, 1998) (No. 447–97/98).

¶ 7 Plaintiffs then sought judicial review by special action filed in the superior court. *See* A.R.S. §§ 12–901 to 12–914. The trial judge affirmed the Commissioner's decision, and Plaintiffs appealed. The court of appeals' majority held that the land must be used for the purpose for which it was classified and that the use could not be changed unless it was reclassified. *Forest Guardians v. Wells,* 197 Ariz. 511, 516 ¶¶ 19–20, 4 P.3d 1054, 1059 ¶¶ 19–20 (App.2000). Relying in part on *Public Lands Council v. Babbitt,* 154 F.3d 1160 (10th Cir.1998), the court concluded that grazing leases could not be issued to conservation groups for the purpose of restoration. *Forest Guardians,* 197 Ariz. at 517 ¶¶ 22–23, 4 P.3d at 1060 ¶¶ 22–23. The court believed that the proper remedy was for Plaintiffs to request reclassification of the land for recreational or conservation purposes. *Id.* at 578 ¶ 29, 4 P.3d at 1061 ¶ 29. Finally, the court found that the factual record did not support the conclusion that Plaintiffs' proposals would be in the best interests of the land. *Id.* at 518 ¶¶ 31–32, 4 P.3d at 1061 ¶¶ 31–32. Dissenting, Judge Gerber argued that the case turned on the Commissioner's fiduciary duties as administrator of the school trust lands. Those duties, he said, were breached by the Commissioner's rejection of the highest bids without first ascertaining the true condition of the land. *Id.* at 522 ¶¶ 51–52, 4 P.3d at 1065 ¶¶ 51–52.

¶ 8 We granted review because the case has statewide importance with regard to operation of the trust, and we examine the propriety of the denial in light of the Commissioner's fiduciary duty with respect to the administration of that trust. *See* Rule 23(c)(3), Ariz.R.Civ.App.P. We have jurisdiction under article VI, § 5(3) of the Arizona Constitution.

## DISCUSSION

### A. The standard of review

¶ 9 The superior court's judgment was rendered on review of an administrative agency's decision. When an agency decision is based on factual determinations, judicial

review is limited to determining whether the administrative action was an abuse of discretion. *See J.W. Hancock Enter., Inc. v. Registrar of Contractors,* 126 Ariz. 511, 513, 617 P.2d 19, 21 (1980). A decision is discretionary when it involves determination of conflicting factual claims, including credibility, contested inferences, and the like. *See State v. Chapple,* 135 Ariz. 281, 297 n. 18, 660 P.2d 1208, 1224 n. 18 (1983). On the other hand, if the administrative decision was based on an interpretation of law, it is reviewed *de novo. See* A.R.S. §§ 12–901 to 12–914 (Administrative Review Act); *see also Mountain States Tel. & Tel. Co. v. Sakrison,* 71 Ariz. 219, 220, 225 P.2d 707, 708 (1950).

■ ¶ 10 In the present case, the Commissioner did not make a discretionary decision but, rather, based rejection of Plaintiffs' applications on an interpretation of law. Plaintiffs' lease applications were ruled "inappropriate because [Plaintiffs] did not intend to put the lands to the use for which they are classified." *See* Denial of Application ¶¶ 3b (No. 146–97/98) and 3c (No. 147–97/98). As the court of appeals acknowledged, the ALJ presiding over Plaintiffs' appeal to the Office of Administrative Hearings

> concluded, *as a matter of law,* that A.R.S. section 37–285(H) "does not allow the Commissioner to waive grazing and authorize nongrazing use for an applicant who has no intention of ever using the lands for ranging livestock." Furthermore, stated the ALJ, [Plaintiffs'] offers to pay more than the existing lessees were paying did not give [Plaintiffs] a superior right to use the lands because the value of the proposed conservation and recreational uses could not properly be established solely by an offer to pay more than the estimate of forage usage, which is the basis for annual grazing lease rentals.

*Forest Guardians,* 197 Ariz. at 514 ¶ 9, 4 P.3d at 1057 ¶ 9 (emphasis added). These conclusions, adopted by the Commissioner and affirmed by the trial court and court of appeals, are not factual determinations of whether Plaintiffs' proposed resting use would be best for the land, would ultimately bring higher or lower revenue than what could realistically be otherwise obtained, or

would benefit or damage the trust or its lands in some other way. Consequently, these legal conclusions, like the question of the impact of duties imposed on the state by the state constitution, are reviewed *de novo.*

## B. The Commissioner's fiduciary duties

¶ 11 The Enabling Act, which permitted formation of our state government, is part of the organic law of the state. *Kadish v. Arizona State Land Dep't,* 155 Ariz. 484, 486, 747 P.2d 1183, 1185 (1987), *aff'd sub nom. ASARCO v. Kadish,* 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). Insofar as it is relevant to this case, the Enabling Act establishes the school land trust and prohibits sale or lease of trust lands "except to the highest and best bidder at a public auction." Enabling Act § 28. Any disposition "not made in substantial conformity" is "null and void, any provision of the Constitution or laws of the said State to the contrary notwithstanding." *Id.* These provisions were incorporated into the Arizona Constitution, which specifically applies to the leasing of trust lands. *See* Ariz. Const. art. X, §§ 1–11; A.R.S. §§ 37–281, 37–281.01. Insofar as constitutional principle is involved, we decide this case solely by application of the state constitution, which, we believe, may establish even more stringent fiduciary requirements than those demanded by the minimum requirements of the Enabling Act.

¶ 12 This court long ago explained the reasoning for the constraints our constitution placed on state government:

> The sad experience of Congress with the handling by these twenty-three states of the granted lands, the sale thereof, and the investment of monies derived from a disposition of the granted lands, brought about a new policy which found expression in the Enabling Act for New Mexico and Arizona. The dissipation of the funds by one device or another, sanctioned or permitted by the legislatures of the several states, left a scandal in virtually every state, and these granted lands and the monies derived from a disposition thereof were so poorly administered, so unwisely invested and dissipated, that Congress concluded to make sure, in light of experiences of the past, that

such would not occur in the new states of New Mexico and Arizona.

*Murphy v. State*, 65 Ariz. 338, 351, 181 P.2d 336, 344 (1947). The trust was created by the Enabling Act, and the restrictions on its administration were imposed to prevent dissipation of the trust assets. *Kadish*, 155 Ariz. at 487, 747 P.2d at 1186.

¶ 13 Thus, the "duties imposed upon the state were the duties of a trustee and not simply the duties of a good business manager." *Id.* Specifically, the Commissioner is subject to the same fiduciary obligations as any private trustee. *Id.* (citing *County of Skamania v. State*, 102 Wash.2d 127, 685 P.2d 576 (1984)). While the trustee's duty of loyalty is paramount among these obligations, the duties to preserve the trust property and make it productive are particularly relevant under the facts of this case. "The trustee is under a duty to the beneficiary to use reasonable care and skill to preserve the trust property." RESTATEMENT (SECOND) OF TRUSTS § 176 (1959). In addition, "[t]he trustee is under a duty ... to use reasonable care and skill to make the trust property productive." *Id.* § 181. "A trustee of land is normally under a duty to lease it or manage it so that it will produce income." *Id.* cmt. a.

¶ 14 With these principles in mind, we turn to the ultimate question: Does article X of the Arizona Constitution permit the Commissioner to reject as inappropriate a high bid for a grazing lease, without considering possible benefit to the land in question or the trust lands in general, merely because the high bidder proposes to rest and restore land that the Commissioner has classified as usable only for grazing?

2. To reduce administrative expenses, the Commissioner appraises all grazing land at a uniform rate based on the number of animals grazed. A.R.S. § 37–285(B).

3. The present statutes empower the Commissioner to "nominate certain trust lands as being under consideration for classification as trust land suitable for conservation purposes." A.R.S. § 37–312(A). Conservation purposes "means protection of the natural assets of state trust lands for the long term benefit of the land, ... and the unique resources that each area contains, such as open space, scenic beauty, protect-

## C. Grazing use and conservation

¶ 15 The statutes controlling administration of the trust require the Commissioner to classify and appraise all school trust lands for the purpose of sale or lease. *See* A.R.S. § 37–132(A)(5). Among the available classifications are grazing and commercial uses. *See* A.R.S. § 37–212(B)(2) and (4). Grazing land is defined as land that "can be used only for the ranging of animals." A.R.S. § 37–101(7). Commercial land is land that "can be used principally for business, institutional, religious, charitable, governmental or recreational purposes, or any general purpose other than agricultural, grazing, mining, oil, homesite or rights-of-way." *Id.* The lands are appraised according to their classification, which is determined by considering their highest and best use. The lands at issue were appraised at full market value for grazing lands, the lowest category of use. A.R.S. § 37–285(B)[2] and (E). But as the Department argues, if commercial use "is an option," the lands would have to be appraised for that higher use, which would probably result in a higher minimum rental. *See* A.R.S. § 37–281.02. This case shows, however, that higher rental may well discourage prospective bidders who seek to restore lands that have been overgrazed or otherwise damaged.

¶ 16 In this court, the Department nevertheless argues that the statutes do not permit the lease of grazing lands to an applicant "who states an intent from the outset never to graze for the full term of the lease." Department's Supplemental Brief at 6. Commercial use, however, includes "general purposes," which, the Department says, could encompass restoration and recreational uses.[3]

ed plants, wildlife, archaeology and multiple use values." A.R.S. § 37–311. Neither party has argued that the lands in question here have been or should be nominated as suitable for conservation purposes. The record does not indicate why or whether such lands would be so suitable, but perhaps the failure to advance the argument is attributable to the fact that the statutes impose strict geographical and other qualifications with respect to lands to be so nominated. *See* A.R.S. § 37–312(A)(1), (2), and (3), and (B). Conservation set-asides and leases are also subject to the renewal rights of existing lessees. *Id.* at (C).

*See* A.R.S. § 37–101(7). The Department maintains that because Plaintiffs refused to apply for reclassification, the Commissioner correctly rejected their applications.

¶ 17 Although the Department's position has surface appeal in terms of administration, it will not wash when examined in light of our constitution, the existing statutory scheme for leasing school trust lands, and the Commissioner's fiduciary duties as trustee of those lands. First, Plaintiffs do not seek to change the long-term use of the land from grazing to commercial use. Grazing leases are limited to ten years, while commercial leases may run for as long as ninety-nine years. *See* A.R.S. §§ 37–281, 37–281.02; *see also* Ariz. Const. art. X, § 9. Plaintiffs seek only ten-year leases with no permanent change in use or classification of the property. Moreover, we find nothing in the definition of commercial land to suggest that it permits the type of non-use Plaintiffs propose.

¶ 18 Second, on this record, Plaintiffs' proposed use does not really conflict with a grazing use. According to Plaintiffs, they intend only to rest the property from overgrazing, thus making it more valuable for future grazing. Testimony at the hearing before the ALJ described at least one parcel as having been overgrazed and reduced to a "moonscape" in need of restoration. Reporter's Transcript (RT), 2/3/98, at 28. Photographs were introduced to support this description. Forest Guardians intended to undertake restoration work, such as fencing off the land to prevent livestock grazing, planting trees, and limiting human access that would interfere with restoration.

*Id.* at 29–30. The Department, however, argued to the ALJ that Plaintiffs were simply trying to get the land at a grazing rate when the non-use "could command a higher rate" for commercial use. *Id.* at 91. "Moonscapes [were] irrelevant. Non-use was not grazing use." *Id.* But the Arizona Education Association's amicus brief cites the Department's 1999–2000 annual report to show that while ninety percent of the school trust land (or 7,433,000 acres out of the present total of approximately 7,900,000 acres) is classified as grazing land, A.R.S. § 37–285(H) permits the Department to "authorize non-use for part or all of the grazing use upon request of the lessee at least sixty days prior to the beginning of the billing date." The evidence before the ALJ indicated that at any given time, the Department has granted non-use permission to grazing lessees covering a very significant number of acres of grazing land. The Department Range Selection Manager conceded that non-use permits could have covered up to one million acres. The Department has in fact adopted regulations permitting a grazing lessee to apply for a non-use permit. *See* A.A.C. R12–5–705(O).[4]

¶ 19 Finally, the land was classified for grazing because it has no other practicable use. *See* A.R.S. § 37–101(7). Yet the Department refuses to consider Plaintiffs' applications unless they apply for commercial reclassification, even though that classification does not expressly permit a non-use, as does § 37–285(H), and a commercial classification might drive prospective bidders away because of the higher appraisal and higher

Also, Forest Guardians disclaims any long-term conservation purpose, seeking only to restore the lands so they are not further damaged and would be available for grazing or reclassification in the future. *See* Forest Guardians' Supplemental Brief at 6. By constitutional amendment of 1950, grazing and other lands may be leased for a ten-year term without prior advertisement and public auction. *See* 1951 Ariz. Sess. Laws (1st Spec. Sess.) at 483. That amendment became effective upon adoption of a like amendment of the Enabling Act. *See* Act June 2, 1951, ch. 120, 65 Stat. 51. This ten-year lease procedure is arguably inapplicable to conservation land. *See* Ariz. Const. art. X, § 3.

4. A.A.C. R12–5–705(O) reads, in pertinent part, as follows:

Use of state lands; failure to use. No lessee or permittee shall use lands under lease or permit to him except for grazing purposes *unless authorized by the Commissioner in writing.*

\* \* \*

Failure of any lessee or permittee to use the land for the purposes for which he holds a lease or permit, without having been authorized to do so by the Commissioner in writing, may, *in the discretion of the Commissioner,* subject said lease or permit to forfeiture or to cancellation as provided by law and these rules and regulations.

(Emphasis added.)

rentals. *See* Department's Reply to Appellant's Response to Department's Motion for Summary Judgment at 6 (February 17, 1998) (No. 97F–031–LAN). Plaintiffs are unwilling to pay those higher rentals for land that has no real commercial value. It appears, in fact, that no one other than the present lessee and Plaintiffs would be interested in leasing the parcels for any purpose. *Id.* at 6–7.

## D. Resolution

¶ 20 Neither the Enabling Act nor our constitution requires classification of property—only that any disposition be made to the highest and best bidder. Property classification, of course, may be an aid to proper administration of the trust, and our constitution permits the legislature to adopt statutory rules for administration that instruct the Commissioner to classify trust lands by present, potential, or appropriate use. But permissive administrative concern and practice must conform to the core fiduciary trust duties imposed by our law. Thus, the fiduciary duties imposed by article X of our constitution forbid the Department and the Commissioner from applying the statutes in such a way as to routinely issue non-use permits to grazing lessees who apply after signing the lease while automatically denying them to the highest, and arguably best, bidder simply because that bidder makes known its intent to restore at the time it tenders its application.[5] The state has advanced no justification for this distinction, and we can conceive of none.

¶ 21 The Commissioner, rather, is required to consider and accept the "highest and best bidder." Ariz. Const. art. X, § 8. What is highest is decided arithmetically; in the present case, Plaintiffs' bids were highest. What is best is a mixed question of fact and law on which the Commissioner has considerable discretionary decision-making power. *See Jeffries v. Hassell,* 197 Ariz. 151, 3 P.3d 1071 (App.1999). We do not diminish that discretion. But restoration and preservation are already and must continue to be considered legitimate uses for land that, according to the Commissioner's classification, has no higher and better use than grazing. Otherwise, grazing lessees could continue to graze stock until the land is damaged and its value destroyed. This fact, no doubt, is one of the reasons why the statutes and regulations presently permit issuance of non-use permits for grazing land.

¶ 22 Thus, despite his discretion, the Commissioner may not summarily disregard and label restorative uses as inappropriate for grazing land. But that is precisely what happened in this case; Plaintiffs' high bids were rejected because they would not apply for a commercial use. Plaintiffs did not want to make a higher commercial use of the land; they sought only a restorative use—one the Commissioner can and does permit under the grazing classification. The Department did not contend these parcels were something other than grazing land, and the Commissioner had so classified them. If that situation changed, the Commissioner could *sua sponte* initiate a reclassification procedure. A.R.S. § 37–212(C). He never attempted to do so.

¶ 23 Under the circumstances presented by this case, we believe the Commissioner's fiduciary duty required him to *consider* Plaintiffs' bids and ascertain whether they were best for the corpus of the trust and its beneficiaries. We are mindful that the high bid is not necessarily the best bid. *See Havasu Heights Ranch & Dev. Corp. v. Desert Valley Wood Prod., Inc.,* 167 Ariz. 383, 392, 807 P.2d 1119, 1128 (App.1990) ("The 'best interest' standard does not require blind adherence...."). But the Commissioner could not reject the high bids without first examining the facts and exercising a fact-based discretion to determine whether those bids would advance the interests of the trust and its beneficiaries. *Brown v. City of Phoenix,* 77 Ariz. 368, 376, 272 P.2d 358, 363–

---

**5.** Thus, the holding in *Public Lands Council v. Babbitt* does not advance the Department's argument. The Secretary of the Interior manages public range lands under the direction of statutes enacted by Congress. The question in *Public Lands Council* was whether the agency had permissibly construed the statute. 154 F.3d at 1167. By contrast, the issue here is whether the agency's arguably permissible construction of the statute complies with the fiduciary duty imposed on the agency by our constitution.

64 (1954). The Department, in other words, cannot use the classification system in such a manner as to discourage or automatically reject those who seek to lease grazing lands for restorative purposes. Such a summary refusal to even consider whether Plaintiffs' offers were in the best interests of the trust was a clear violation of the fiduciary duties imposed by the state constitution.

¶ 24 The dissent attempts to make a federal case out of a plain question of fiduciary duty. Thus, the "notion [that] classification derived directly from the Enabling Act" is both true and unchallenged by this opinion. *See* Dissent at ¶ 32. We do not hold that the legislature is forbidden to classify; nor do we hold that the classification statutes are unconstitutional. Quite the contrary. *See* Opinion at ¶ 20. But the constitutional permission to classify and, with respect to ten-year leases, to dispose of land without advertisement and public auction does not give the legislature, the Commissioner, or the Department a right to use or apply classification as a device to defeat the core requirement that any disposition be made to the highest and best bidder.

¶ 25 The dissent argues further that there is no requirement that school trust lands be sold or leased at all and that the Commissioner has the statutory authority to withdraw such lands from sale or lease if he deems non-use to be in the best interests of the trust. Dissent at ¶¶ 35, 37. This is true; it is also unaffected by anything in this opinion. However, in this case the Commissioner neither withdrew, nor reclassified the land. He is still free to do so, "exercising a fact-based discretion."[6] *See* Opinion at ¶¶ 22, 23.

 ¶ 26 Finally, the dissent argues that Plaintiffs could have applied for a withdrawal of the land from leasing, which would have cost nothing and left open the possibility of judicial review if their application were unsuccessful.[7] Dissent at ¶ 38. Instead Forest Guardians sought to lease—and pay—for re-

storative use, as permitted for grazing lessees. We hold simply that the Commissioner may not apply the statutes to reject the applications of high bidders just because restoration or preservation is proposed. The fact that alternative courses of action were open to Plaintiffs does not destroy the legitimacy of the one they chose in this case.

### CONCLUSION

¶ 27 As Judge Gerber noted in his dissent, restoration and preservation of the seven-plus million acres of school trust land classified as grazing lands are part of good range stewardship. *Forest Guardians,* 197 Ariz. at 522 ¶ 50, 4 P.3d at 1065 ¶ 50 (Gerber, J., dissenting). They are uses that must be considered by the Commissioner, especially when proposed by the high bidder. They are not irrelevant uses, as argued to the ALJ by the Department. The Commissioner may not reject such a proposal by the high bidder as inappropriate for land useful only for grazing when those who lease for grazing are routinely permitted to make such uses. Nor may the Department apply the classification statutes so as to discourage conservationists and others from bidding on grazing land by requiring them to have the land reclassified and pay the higher rentals resulting from commercial classification. If the parcels in question are usable for something more or better than grazing (including restoration and preservation), then the Department should, as it is permitted to do, institute reclassification procedures and open the land to commercial bidders. But the lands in question are far from having any use as sites for a Neiman Marcus, a Wal Mart, or a ski resort. More cogently, as Judge Gerber noted, the Department's policy of rejecting all bidders who seek to restore and rest grazing land forces them

> not only out of the lease market but also out of the market pool protecting the land. Value maximizing land policy also suffers: lessee ranchers can ignore the costs they

---

6. This would include, of course, input from the Grazing Land Valuation Commission. Contrary to the fears expressed in the dissent, we do not lessen its power. Dissent at ¶ 40. We only require that restoration be considered as a legitimate use for land that is classified for grazing.

7. Moreover, simply withdrawing the land from leasing would not have allowed for the restorative steps Plaintiffs proposed to take. *See* Opinion at ¶ 18.

impose on other users and on the land itself when they "moonscape" instead of practicing sustainable range stewardship. Overgrazing both reduces cattle weights and hurts the land's future utility. Moonscaping becomes truly "irrelevant" when the only [economic] incentive is to exhaust present resources of grass and water. . . . 197 Ariz. at 524 ¶ 59, 4 P.3d at 1067 ¶ 59 (Gerber, J., dissenting).

¶ 28 The court of appeals' opinion is vacated and the superior court's judgment is reversed. The case is remanded to the trial court with instructions to enter judgment requiring the Commissioner to determine whether Plaintiffs' high bids were, in the long term, best for the school trust lands and their beneficiaries. If so, the Commissioner shall accept the bids and issue the leases.

CONCURRING: THOMAS A. ZLAKET, Chief Justice, CHARLES E. JONES, Vice Chief Justice, and WILLIAM E. DRUKE, Judge.

MARTONE, Justice, dissenting.

¶ 29 The majority's resolution of this case is superficially appealing. After all, what could be wrong with requiring the state land commissioner to consider a higher bid when the bidder would not even use or consume the trust asset? If that is what this case were all about, I would join the majority. But there is more here than meets the eye.

I.

¶ 30 This case arises under Arizona's Enabling Act, Act of June 20, 1910, ch. 310, §§ 19–35, 36 Stat. 557, 568–79. It thus presents a federal question. Article X of the Arizona Constitution was adopted to comply with the Enabling Act. But the Enabling Act is "superior to the Constitution of the State of Arizona." *Gladden Farms, Inc. v. State*, 129 Ariz. 516, 518, 633 P.2d 325, 327 (1981). Article X of the Arizona Constitution simply incorporates the Enabling Act. *Id.* The trust is created by section 28 of the Enabling Act and any disposition contrary to the provisions of the Act "shall be deemed a breach of trust." Act of June 20, 1910, ch. 310 § 28, 36 Stat. 557, 574–75. Whether the trust is

breached, and therefore whether the act is violated, is a federal question. *See Ervien v. United States*, 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128 (1919). The majority is thus in error when it decides "this case solely by application of the state constitution." *Ante*, at ¶ 11. Its express refusal to rest its decision on the Enabling Act is both an admission that the Act does not support its position, and an attempt to avoid further federal judicial review.

II.

¶ 31 The majority says "[n]either the Enabling Act nor our constitution requires classification of property—only that any disposition be made to the highest and best bidder." *Ante*, at ¶ 20. Proceeding from this premise, the court concludes that the commissioner must consider whether a bid is best when it is the highest despite the property's classification.

¶ 32 But the notion of classification derives directly from the Enabling Act. While section 28 of the Enabling Act provides that trust lands shall not be leased "except to the highest and best bidder at a public auction," it also provides that "[n]othing herein contained shall prevent: . . . the leasing of any of the lands referred to in this section, in such manner as the Legislature of the State of Arizona may prescribe, for grazing, agricultural, commercial, and domestic purposes, for a term of ten years or less." Act of June 20, 1910, ch. 310, § 28, 36 Stat. 557, 574–75. Thus, the Enabling Act itself creates the category of "grazing leases" and specifically authorizes the legislature to determine the manner in which such leases shall be granted.

¶ 33 Section 20 of the Enabling Act required Arizona to adopt a constitution that incorporated the Enabling Act by reference. Act of June 20, 1910, ch. 310, § 20, 36 Stat. 557, 569–71. Thus, Article X, section 3 of the Arizona Constitution expressly tracks that part of section 28 of the Enabling Act that requires leasing to "the highest and best bidder," but also empowers the legislature to determine the manner of leasing for ten years or less "for grazing, agricultural, com-

mercial and homesite purposes." Ariz. Const. art. X, § 3.

¶ 34 Beginning in 1915, the legislature required the classification of land pursuant to the authority granted it by the Enabling Act and the constitution. Act of June 26, 1915, ch. 5, § 15, 1915 Ariz.2d Spec. Sess. 13, 19–20. Thus, A.R.S. section 37–212, from 1915 to this day, has required the commissioner to classify all lands selected under the Enabling Act. A.R.S. § 37–212 (West 1993 & Supp. 2000). The statute incorporates by reference the classifications created by both the Enabling Act and the constitution, including lands suitable for grazing purposes. A.R.S. § 37–212(B)(2).

¶ 35 This organic structure is a simple recognition of the fact that the commissioner, as trustee, must evaluate and classify land in order to know what its best use is. Without consideration of best use, state lands would always go to the highest bidder, the lands would be dissipated and Arizona would have no public lands. The Enabling Act is not a straightjacket. It does not require Arizona to dispose of its lands at all, let alone to the highest bidder.

¶ 36 A tension exists between the preservation of Arizona's public lands, on the one hand, and their use or disposition to maximize income to the trust for the purpose of public education. *See, e.g.,* Douglas Dunipace, Comment, *Arizona's Enabling Act and the Transfer of State Lands for Public Purposes,* 8 Ariz. L.Rev. 133 (1966). Preservation and education are both contemplated by the Enabling Act and the wise administration of the trust will not kill the goose that laid the golden egg. The Enabling Act created the trust and specifically authorized the legislature to create the terms of that trust. Two of those terms directly address the question of nonuse of public lands.

¶ 37 The first is A.R.S. section 37–132(A)(11) which provides that "[t]he commissioner *shall* ... [w]ithdraw state land from surface or subsurface sales or lease applications if the commissioner deems it to be in the best interest of the trust." A.R.S. § 37–132 (West 1993 & Supp.2000) (emphasis added). Contrary to the majority's suggestion, *ante,* at ¶ 25, the commissioner is not only authorized to withdraw land when necessary, but is required to do so. The commissioner thus has an independent obligation to examine land classified for grazing purposes and decide whether the conditions are such that the trust would be benefitted by resting or nonuse. If, as Forest Guardians claims and the majority asserts, the lands here were in need of restoration, the commissioner would have breached his fiduciary duty by failing to withdraw the lands.

¶ 38 Forest Guardians could have asked the state land commissioner to withdraw the subject land from leasing had it believed the land was being overgrazed. The decision to withdraw it is properly that of the land commissioner as trustee and not that of any individual group or organization. On the other hand, if Forest Guardians were aggrieved by a decision of the state land commissioner not to withdraw the land from leasing, it could have sought judicial review of that decision alleging a breach of the trust terms. Under this approach, the state land commissioner could have determined the highest and best use of the land under the trust responsibility without violating A.R.S. section 37–281(D) which provides that "[n]o lessee shall use lands leased to him except for the purpose for which the lands are leased." A.R.S. § 37–281 (West 1993 & Supp.2000).

¶ 39 The second is A.R.S. section 37–285 which contains an elaborate mechanism for the exercise of the trust responsibility over grazing leases. Section 37–285(C) creates a Grazing Land Valuation Commission consisting of five members appointed by the governor. A.R.S. § 37–285 (West 1993 & Supp. 2000). Among them, one must be a professional appraiser. One member must be a faculty member of the College of Agriculture at the University of Arizona. And one member must be a conservationist. The Grazing Land Valuation Commission is charged with gathering information in order to properly appraise all lands classified as grazing lands, using both the market and income approaches. Among the factors the Commission must consider are the condition and carrying capacity of the land. A.R.S. § 37–285(E)(5).

¶ 40 In addition, the state land commissioner may reclassify and reappraise, A.R.S. § 37–285(G), and, even after lands are leased for grazing purposes, the state land department "may authorize nonuse for part or all of the grazing use upon request of the lessee at least sixty days prior to the beginning of the billing date." A.R.S. § 37–285(H). Requiring the state land commissioner to consider a proposed grazing lease where the proposed lessee, such as Forest Guardians here, elects not to use the land is absolutely inconsistent with the obligations of the Grazing Land Valuation Commission and the commissioner under this statute.

¶ 41 The statutes define the universe of nonuse of lands classified for grazing purposes. If they are being overgrazed, the commissioner has a trust responsibility to withdraw them from leasing in the first instance. If already leased, the commissioner has the responsibility to allow nonuse. In all instances, the trust responsibility is to be exercised by the state land commissioner on behalf of the state, and not by a group or association seeking a lease. Here, Forest Guardians seeks to do by indirection that which is the responsibility of the state land commissioner under the terms of the trust.

¶ 42 Of course, Forest Guardians is not asking to be granted the lease but only that its application be considered. But how could the state land commissioner consider the application without violating its own duties as a trustee? For if the lands are truly overgrazed, the commissioner must withdraw them from leasing under A.R.S. section 37–132(A)(11). It could not possibly grant such a lease without breaching its fiduciary duty. The best interests of the trust are served when the trustee is required to exercise its responsibilities under the terms of the trust. It is not served by allowing a private group to relieve the trustee of its responsibility by doing for the state that which the state must do for itself.

¶ 43 While Forest Guardians' application may appear innocuous enough, the majority's holding puts a premium on the highest bid, even to the extent of allowing the state land commissioner to ignore our statutes without any good and sufficient reason to do so.

¶ 44 Difficult cases sometimes create bad law. I fear this is one of them. It is hard to predict the consequences that might flow from the majority's ruling that requires the commissioner to consider the highest bid even when the property is not going to be used for the purpose for which the lease is intended. By requiring the land commissioner to consider a fictional grazing lease we do violence to a fairly well structured statutory system without any benefit that cannot already be obtained through that same system. I therefore respectfully dissent.

Justice RUTH V. McGREGOR recused herself and did not participate in the determination of this matter; pursuant to Arizona Constitution article VI, § 3, the Honorable William E. Druke, Judge of the Arizona Court of Appeals, Division Two, was designated to sit in her stead.