268 P.3d 1120

Rae Ann RUMERY; John Skarhus; and Cartwright Elementary School District, Plaintiffs/Appellees,

v.

Maria BAIER, in her capacity as Arizona State Land Commissioner, Defendant/Appellant,

and

Doug Ducey, in his capacity as State Treasurer, Defendant.

No. 1 CA–CV 10–0807.

Court of Appeals of Arizona, Division 1, Department B.

Nov. 10, 2011.

Arizona Center for Law in the Public Interest By Timothy M. Hogan and Joy E. Herr–Cardillo, Phoenix, Attorneys for Plaintiffs/Appellees.

Thomas C. Horne, Arizona Attorney General By David F. Jacobs, Assistant Attorney General, Tucson, Attorneys for Defendant/Appellant Maria Baier in her capacity as Arizona State Land Commissioner.

LaSota & Peters, P.L.C. By Donald M. Peters and Kristin M. Mackin, Phoenix, Attorneys for Amici Curiae The Arizona School Boards Association and The Arizona Association of School Business Officials.

## OPINION

KESSLER, Judge.

¶1 Defendant/Appellant Maria Baier, Arizona State Land Commissioner ("Commissioner"), appeals the trial court's summary judgment for Plaintiffs/Appellees Rae Ann Rumery, John Skarhus, and Cartwright Elementary School District.[1] Plaintiffs complained in part that the Arizona Legislature violated the Arizona Constitution and the New Mexico–Arizona Enabling Act when it enacted Arizona Revised Statutes ("A.R.S.")

1. Defendant Doug Ducey and his predecessor Dean Martin, acting as State Treasurer, did not join the Commissioner's cross-motion for summary judgment or file an appeal from the trial court's ruling.

2. We cite the current version of statutes when no revisions material to this decision have occurred since the underlying events.

3. The trial court also held that the Legislature violated the voter-protection provisions in Article 4, Part 1, Section 1(6)(C), of the Arizona Constitution, when it passed A.R.S. § 37–527 without a three-quarters vote. Because A.R.S. § 37–527 violates Article 10, Section 7, of the Constitution, we need not address whether the law also violated the voter-protection provisions.

4. The enumerated beneficiaries of the state trust land are the universities; asylums and a school

section 37–527 (Supp. 2010),[2] to establish a fund comprised of proceeds derived from trust lands to pay for management of trust lands. The trial court held that A.R.S. § 37–527 violated Article 10, Section 7, of the Arizona Constitution because the "appropriation of proceeds from state trust lands for trust administrative expenses clearly diverts money from the permanent state school fund specified in [A.R.S.] § 37–521." We agree with the trial court and thus affirm.[3]

## FACTUAL AND PROCEDURAL HISTORY

¶2 In 1910, Congress granted Arizona over 10.7 million acres of land to be held in trust for enumerated beneficiaries, with the "common schools" being the largest beneficiary.[4] *Lassen v. Arizona ex rel. Ariz. Highway Dep't*, 385 U.S. 458, 460, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967). In granting the lands, Congress set forth rules governing the use of the trust lands, found in the New Mexico–Arizona Enabling Act of June 20, 1910, 36 Stat. 557. *Id.* at 461, 87 S.Ct. 584. "[T]he Arizona electorate accepted the land grants by ratifying" Article 10, Section 1, of the Arizona Constitution in 1911, and the "full provisions of the Enabling Act became part of the organic law of this state." *Kadish v. Ariz. State Land Dep't*, 155 Ariz. 484, 486, 747 P.2d 1183, 1185 (1987), *aff'd sub nom. ASARCO Inc. v. Kadish*, 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). However, the Enabling Act and the Arizona Constitution are silent as to how the costs of managing the trust lands are to be paid.[5]

for the hearing, visually, and cognitively impaired; normal schools; an agricultural and mechanical college; school of mines; legislative, executive, and judicial public buildings; penitentiaries; "insane asylums"; hospitals for disabled miners; state charitable, penal, and reformatory institutions; military institutes; and Maricopa, Pima, Yavapai, and Coconino counties for payment of bonds. New Mexico–Arizona Enabling Act of June 20, 1910, 36 Stat. 557, § 25. The Arizona Constitution set up a permanent fund for each beneficiary. Ariz. Const. art. 10, § 7(A); *see also* A.R.S. §§ 37–521 to –525 (Supp.2010).

5. For a more detailed history of the Enabling Act and its provisions, *see Kadish*, 155 Ariz. at 486–88, 747 P.2d at 1185–87, and *Murphy v. State*, 65 Ariz. 338, 344–53, 181 P.2d 336, 339–46 (1947).

¶ 3 Prior to 2009, the legislature paid the administrative expenses of managing state trust lands from the state general fund. Proceeds derived from state trust lands were distributed to the individual funds (called permanent funds) of the enumerated beneficiaries to be held in trust by the Commissioner. Ariz. Const. art. 10, § 7(A).

¶ 4 In 2009, the legislature passed HB 2014, now codified in A.R.S. § 37–527, which set up the Trust Land Management Fund ("Management Fund"). 2009 Ariz. Sess. Laws, ch. 5, § 9 (3d Spec. Sess.). Section 37–527 provides that up to ten percent of both the annual proceeds from "[e]ach beneficiary's trust lands" and "[a]ll sales of timber, mineral, gravel or other natural products or property from each beneficiary's trust lands" are to be deposited into the Management Fund "exclusively to manage trust lands." The money in the Management Fund is appropriated to the Arizona State Land Department, the agency that manages the trust lands. A.R.S. § 37–102 (Supp. 2010); *Forest Guardians v. Wells*, 201 Ariz. 255, 257, ¶ 2, 34 P.3d 364, 366 (2001). The Commissioner administers the Management Fund. A.R.S. § 37–527(D). Section 37–527(F) provides that it "does not prevent the legislature from appropriating state general fund monies for the purposes" of paying for the costs to manage the trust lands.

¶ 5 In passing HB 2014, the Legislature also appropriated over $9.7 million in fiscal year 2010 from proceeds derived from trust land, thereby diverting some money from entering the trust into the Management Fund. 2009 Ariz. Sess. Laws, ch. 5, § 18 (3d Spec. Sess.). For fiscal year 2011, the Commissioner designated the full ten percent of funds allowed by A.R.S. § 37–527, approximately $10.5 million, for deposit in the Management Fund. As the Commissioner conceded at oral argument on appeal, other than possibly its fiduciary duties, nothing would prevent the Legislature from passing a statute taking ninety percent or more of the funds to pay to manage the trust lands.

¶ 6 Plaintiffs filed suit alleging the legislature violated Section 28 of the Enabling Act (regulating the deposit of proceeds derived from state trust lands); Article 10, Section 7,

of the Arizona Constitution (same); and the voter-protection provisions of the Arizona Constitution.

¶ 7 Plaintiffs and the Commissioner filed motions for summary judgment. The trial court granted Plaintiffs' motion, holding that A.R.S. § 37–527 violated Article 10, Section 7, as well as Article 4, Part 1, Section 1(6)(D), of the Arizona Constitution. In so holding, the court rejected the Commissioner's argument that common-law principles of trust law apply. The court held that "the language of Art. 10, § 7 is clear and unambiguous" and thus resorting "to [common-law] principles to modify or clarify the language is contrary to established Arizona law." It also held the "appropriation of proceeds from state trust lands for trust administrative expenses clearly diverts money from the permanent state school fund specified in [A.R.S.] § 37–521," and the legislature's doing so without a three-quarters vote violated the voter-protection provisions. The court did not address whether the law violated the Enabling Act.

¶ 8 The trial court enjoined the Commissioner "from designating any amount of state trust land proceeds for deposit into the State Trust Land Management Fund," ordered the state treasurer to "deposit all state trust land proceeds into the appropriate permanent funds," and ordered "all amounts previously transferred from state trust land proceeds to the Trust Land Management Fund, whether expended or not, be repaid by the … Commissioner to the State Treasurer for deposit into the separate permanent funds." The court also awarded Plaintiffs their attorneys' fees and costs and denied the Commissioner's motion to stay injunctive relief pending appeal.

¶ 9 The Commissioner filed a timely notice of appeal. We granted a stay of the trial court's order pending appeal, which terminated on June 30, 2011. We have jurisdiction pursuant to A.R.S. § 12–2101(B) (2003).

### STANDARD OF REVIEW

¶ 10 We review *de novo* "a grant of summary judgment determining the constitutionality of legislation and interpretation of statutes." *Ariz. Farm Bureau Fed'n v.*

*Brewer,* 226 Ariz. 16, 19, ¶ 6, 243 P.3d 619, 622 (App.2010).

## DISCUSSION

¶ 11 The issue before us is whether the Arizona Constitution allows the cost of managing state trust lands to be paid from proceeds derived from those lands. Such diversion of trust land proceeds violates Article 10, Section 7, because it deprives the trust beneficiaries of the full benefit of the trust without express permission. If the Legislature desires to use the proceeds from trust lands to pay for managing trust lands, it must obtain permission from the people of Arizona in the form of a constitutional amendment.

## I. We decide this case based solely on the provisions of Arizona's Constitution.

¶ 12 Because our constitution's provisions regarding the distribution and use of trust lands are more restrictive than the current Enabling Act's provisions, we decide this case solely based on provisions in Arizona's Constitution.

¶ 13 While "[t]he Enabling Act is one of the fundamental laws of the State of Arizona and is superior to the Constitution of the State of Arizona," *Gladden Farms, Inc. v. State,* 129 Ariz. 516, 518, 633 P.2d 325, 327 (1981), our constitution "may establish even more stringent ... requirements than those demanded by the minimum requirements of the Enabling Act," *Forest Guardians,* 201 Ariz. at 259, ¶ 11, 34 P.3d at 368. In fact, the "Enabling Act, as interpreted in *Lassen,* merely sets out the minimum protection for our state trust land," but "our state constitution does much more." *Deer Valley Unified Sch. Dist. v. Superior Court,* 157 Ariz. 537, 541, 760 P.2d 537, 541 (1988).

¶ 14 Section 28 of the current Enabling Act requires:

[A]ll lands hereby granted ... shall be by the said state held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same.... Distributions from the trust funds shall be made as provided in article 10, Section 7 of the Constitution of the state of Arizona.

\* \* \*

Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than for such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this act, shall be deemed a breach of trust, except [for] amounts in the Miners' Hospital Endowment Fund....

¶ 15 In turn, Arizona's Constitution sets forth parameters to protect the trust and its beneficiaries, including creating permanent funds for each of the "objects" (beneficiaries). Ariz. Const. art. 10, § 7(A). The Constitution provides:

[W]henever any monies shall be in any manner derived from any of said lands, the same shall be deposited by the [S]tate [T]reasurer in the [corresponding] permanent fund.

\* \* \*

No monies shall ever be taken from one permanent fund for deposit in any other, or for any object other than that for which the land producing the same was granted or confirmed.

*Id.* at § 7(A), (B). The above quoted sections of the Arizona Constitution were also included in the original Enabling Act, but in 1957 Congress deleted such language. New Mexico–Arizona Enabling Act, amendments, Pub. L. No. 85–180, 71 Stat. 457–58 (1957). It did so not to permit Arizona to use trust fund proceeds to manage state trust lands, but rather to allow greater flexibility for investing funds.[6] *Id.*[7] Thus, because article

---

**6.** Douglas R. Norton, *State of Arizona Office of the Attorney General Performance Audit of the Arizona State Land Department,* No. 97–6, 42 (Apr.1997), available at http://www.azauditor.gov/Reports/State_Agencies/Agencies/Land_Department/Performance/97–6/97–6.pdf.

10, § 7(A) of our constitution places greater restrictions on the use of trust proceeds than does the current version of the Enabling Act, we resolve this case based solely on our constitution.[8]

## II. A.R.S. § 37–527 violates Article 10, Section 7, of the Arizona Constitution.

¶ 16 The Commissioner asserts that A.R.S. § 37–527 is constitutional under Article 10, Section 7, for three reasons. First, she argues the state trust lands were granted to support the enumerated beneficiaries, and any expenditure to manage and dispose of those lands (as part of the State Land Department's budget) also supports the beneficiaries. Second, she contends the framers intended for management costs to be paid from trust assets because other state courts had already permitted such use of similar trust assets, and the framers would have explicitly provided otherwise if they did not agree with those decisions. She also relies on one federal court decision that interpreted the Enabling Act to permit such use of trust assets under common-law principles. Third, the legislature allowed "payment of expenses of timber sales on university lands from the university's permanent fund" in 1915; thus, it believed it could use trust proceeds to fund trust management.

¶ 17 We agree with the trial court that Article 10, Sections 7(A) and (B) are unambiguous. The provisions require any money derived from trust assets to be deposited in the permanent fund and forbid the money from being used for any purpose other than that for which the land was granted or con-

firmed. Both the United States Supreme Court and the Arizona Supreme Court have held that the purpose of the land grant was to support the beneficiaries with the full benefit of the trust assets. *Lassen*, 385 U.S. at 467–68, 87 S.Ct. 584; *Fain Land & Cattle Co. v. Hassell*, 163 Ariz. 587, 595, 790 P.2d 242, 250 (1990). Diverting money from the permanent funds for management of the trust lands does not confer the full benefit of the trust proceeds on the beneficiaries.

### A. Rules of Constitutional Construction

¶ 18 "When interpreting the scope and meaning of a constitutional provision . . . [o]ur primary purpose is to effectuate the intent of those who framed the provision. . . ." *Jett v. City of Tucson*, 180 Ariz. 115, 119, 882 P.2d 426, 430 (1994). "To this end, we first examine the plain language of the provision," and if "the language is clear and unambiguous, we generally must follow the text of the provision as written." *Id.* (citation omitted). We do not permit extrinsic evidence "to support a construction that would vary" the apparent meaning of a constitutional provision. *Id.* In cases dealing with trust lands, "all doubts must be resolved in favor of protecting and preserving trust purposes." *Kadish*, 155 Ariz. at 495, 747 P.2d at 1194.

### B. The history and purpose of the Enabling Act and Article 10, Section 7, of the Arizona Constitution

¶ 19 While we are not interpreting the Enabling Act, its history tracks that of the

---

7. Section 28 of the original Enabling Act provided:

    [A]ll lands hereby granted . . . shall be by the said state held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same.

                \* \* \*

    *A separate fund shall be established for each of the several objects for which the said grants are hereby made or confirmed, and whenever any moneys shall be in any manner derived from any of said land the same shall be deposited by the state treasurer in the fund corresponding to the grant under which the particular land pro-*

*ducing such moneys was by this Act conveyed or confirmed. No moneys shall ever be taken from one fund for deposit in any other, or for any object other than that for which the land producing the same was granted or confirmed.* (Emphasis added.) Congress deleted the italicized portion in 1957. 71 Stat. 457–58.

8. *Cf. Fain Land & Cattle Co. v. Hassell*, 163 Ariz. 587, 596, 790 P.2d 242, 251 (1990) (holding that Article 10, Section 8, of the Arizona Constitution did not create greater restrictions than the Enabling Act on exchanges of trust lands because Section 8 provided that every disposition of or contract concerning trust lands would be null and void if "not made in substantial conformity with the provisions of the Enabling Act").

Arizona Constitution. Our supreme court's interpretation of the Enabling Act and its restrictions is informative and controlling in applying Article 10, Section 7, of the Arizona Constitution.

¶ 20 In passing the Enabling Act, Congress intended that "the general powers of sale and lease given [Arizona] by the Act [be used] to accumulate funds with which [Arizona] could support its schools." *Lassen*, 385 U.S. at 463, 87 S.Ct. 584. All the Act's enumerated restrictions "indicate Congress' concern ... that the grants provide *the most substantial support possible* to the beneficiaries and that only those beneficiaries profit from the trust." *Id.* at 467, 87 S.Ct. 584 (emphasis added). Thus, the "purposes of Congress require that the Act's designated beneficiaries derive the *full benefit* of the grant." *Id.* at 468, 87 S.Ct. 584 (citation and internal quotation marks omitted) (emphasis added). "The purpose of the restrictions in article 10 of our constitution is the same" as the Enabling Act's purpose: "to ensure that the trust receives the most benefit possible from the trust lands." *Fain*, 163 Ariz. at 595, 790 P.2d at 250.

¶ 21 "The Enabling Act unequivocally demands ... that any funds received be *employed only for the purposes* for which the land was given." *Lassen*, 385 U.S. at 466, 87 S.Ct. 584 (emphasis added). To accomplish these purposes, the Enabling Act "imposes a series of careful restrictions upon the use of trust funds," and the Act's specific "enumeration of the purposes for which the lands were granted ... is *necessarily exclusive of any other purpose*." *Id.* at 467, 87 S.Ct. 584 (quoting *Ervien v. United States*, 251 U.S. 41, 47, 40 S.Ct. 75, 64 L.Ed. 128 (1919)) (emphasis added); *Kadish*, 155 Ariz. at 487, 747 P.2d at 1186 (stating Congress "intended the Enabling Act to severely circumscribe the power of state government to deal with the assets of the common school trust"). The provisions in the Enabling Act governing disposition of lands and proceeds derived therefrom "preclude[s] any license of construction or liberties of inference." *Ervien*, 251 U.S. at 47, 40 S.Ct. 75.

### C. A.R.S. § 37–527 deprives the trust beneficiaries of the most substantial support possible of the trust and thus violates Article 10, Section 7, of the Arizona Constitution.

¶ 22 The Arizona Constitution is very specific in setting forth the assets that comprise the permanent funds and the rules for the management of each fund's assets. Ariz. Const. art. 10, § 7(B)-(G). As noted above, the key provisions in this case, Article 10, Sections 7(A) and (B), provide:

(A) [W]henever any monies shall be in any manner derived from any of said lands, the same shall be deposited by the [S]tate [T]reasurer in the permanent fund corresponding to the grant under which the particular land producing such monies was, by the [E]nabling [A]ct, conveyed or confirmed.

\* \* \*

(B) No monies shall ever be taken from one permanent fund for deposit in any other, or for any object other than that for which the land producing the same was granted or confirmed.

¶ 23 Taking funds that the Arizona Constitution requires be deposited in the trust to pay for managing the trust lands deprives the beneficiaries of "the most substantial support possible" and "full benefit of the grant." *Lassen*, 385 U.S. at 467, 468, 87 S.Ct. 584; *see also Fain*, 163 Ariz. at 595, 790 P.2d at 250. Section 37–527 allows the use of trust proceeds to assist the State in reducing budget deficits. In doing so, it diverts money from the trusts' permanent funds, depriving the trusts of the value of lands sold and products derived from such lands, as well as interest earned on those proceeds. It is a paramount requirement that the trusts must be fully compensated for any lands or products lost from the trust through sales. *See Lassen*, 385 U.S. at 465, 87 S.Ct. 584 (stating the "trust will be protected, and its purposes entirely satisfied, if the State is required to provide full compensation for the land it uses"). Diverting ten percent of annual proceeds of the trust lands and all sales of natural products or property from the trust lands deprives the beneficiaries of the full benefit of the trust land.

¶ 24 If A.R.S. § 37–527 was constitutional, the amount of funds subject to diversion to pay for management of the lands would be subject to legislative fiat. In advancing her argument, the Commissioner contended during oral argument that the legislature could pass a statute to divert ninety percent of trust funds as long as doing so is within the bounds of the State's fiduciary duty owed to the beneficiaries. Such an argument belies the Commissioner's argument that diversion of trust land proceeds is constitutional.

¶ 25 Given the express provisions requiring any money derived from trust assets be deposited in the permanent funds and prohibiting using trust assets for any purpose other than for the beneficiaries, Article 10, Sections 7(A) and (B), are unambiguous.[9] Because using trust assets and would-be assets to pay for management of the trust lands deprives the beneficiaries from the full benefit of the trust, A.R.S. § 37–527 violates Article 10, Section 7, of the Arizona Constitution.

¶ 26 Thus, we reject the Commissioner's first argument that diversion of trust assets to offset management costs fulfills the constitutional mandate to fully benefit the beneficiaries of the trust lands. If the legislature wishes to fund the management of state trust lands from proceeds of the trust, it should refer a proposition to Arizona's voters as it has done in the past when it both successfully and unsuccessfully sought to change how state trust lands were managed, used, or invested.

¶ 27 Our conclusion is further supported by the most recent decision on this issue. In 1977, the Idaho Supreme Court also addressed the issue of diversion of trust fund assets. The court declared unconstitutional the transfer of interest income of the public school endowment fund (the equivalent of our permanent school fund) from the Investment Board, tasked with investing the fund's assets, to a separate expense fund to pay the Board's expenses of investing the trust's assets. *Moon v. Inv. Bd.*, 98 Idaho 200, 560 P.2d 871, 872 (1977) (per curiam). At the time, Idaho's constitution provided:

> The public school fund of the state shall forever remain inviolate and intact; the interest thereon only shall be expended in the maintenance of the schools of the state.... No part of this fund, principal or interest, shall ever be transferred to any other fund, or used or appropriated except as herein provided.

Idaho Const. art. 9, § 3 (pre–1998).[10]

### III. The Commissioner's other arguments

■ ¶ 28 The Commissioner's reliance on common-law trust principles, the decisions of other state courts prior to approval of our constitution, and a law similar to section 37–527 passed in 1915, is misplaced. The Commissioner argues the constitutional framers intended to impute the common-law practice of paying expenses of trust management from the trust assets because other state courts had already held it constitutional to do so. She argues that if the framers did not agree with those state's decisions, they would have explicitly provided otherwise.

¶ 29 We disagree with the Commissioner because the two courts that decided this issue prior to Arizona statehood disagreed as to the constitutionality of the provisions before them. Thus, the law was unsettled when our framers drafted our constitution and, if they were aware of the decisions of other states, they presumably would have added language to Article 10 to permit such diversion of trust assets. In any event, "little or no precedent exists, in acts pursuant to which other states were admitted into the Union or in decisions or legislative enact-

---

9. The Commissioner points out that the framers created a very narrow exception to Section 7(A)'s mandate that all money derived from trust lands be deposited in the permanent funds. In Article 11, Section 8, the framers arguably created an exception to Article 10, Section 7(A), by allowing rental income from trust lands held for the common schools to be directly given to the common and high schools. John S. Goff, *The Records of the Arizona Constitutional Convention of 1910* 945–47 (1991). This exception is inapposite as to whether the framers intended trust proceeds to be used for such a purpose as paying for the State's budget related to management of trust lands.

10. The citizens of Idaho later amended the constitution to allow the legislature to appropriate management expenses from the endowment fund. Idaho. Const. art. 9, § 3 (amended 1998).

ments of other states, to aid us in the proper construction of the provisions of our Enabling Act and applicable constitutional provisions." *Murphy v. State*, 65 Ariz. 338, 353, 181 P.2d 336, 346 (1947).

¶ 30 Prior to the drafting of the Arizona Constitution, two states—Nevada and Oklahoma—had addressed the use of state trust land proceeds to pay for the management of the trust lands. *Nevada ex rel. Greenbaum v. Rhoades*, 4 Nev. 312 (1868); *Betts v. Comm'rs of the Land Office*, 27 Okla. 64, 110 P. 766 (1910). The courts of these states disagreed as to the constitutionality of using trust assets to pay for the maintenance of trust lands.

¶ 31 In *Betts*, the Oklahoma Supreme Court decided that expenses of managing the state trust lands granted for the common schools could not be paid from money derived from state trust lands under Oklahoma's constitution, except that rental proceeds could be used to pay for the expenses of leasing trust land. 110 P. at 768.[11] The *Betts* court held that provisions in Oklahoma's constitution forbade the use of income and interest of the permanent school funds to pay expenses related to leasing and investing, and forbade the use of sales proceeds to pay the expenses related to the same. *Id.* ("[N]o part of the interest and income of the permanent school fund as defined by section 2 of article 11 of the Constitution may be used to pay the expenses of leasing or investing such fund. Also, the expenses of the sale of such lands for the use and benefit of the common school fund must be paid otherwise than out of the proceeds of such sales and the interest and income from said fund.").

However, the court held Oklahoma's constitution did not bar use of trust proceeds to pay for expenses in managing "public lands set apart to the state by Congress for charitable, penal, and educational purposes." *Id.*

¶ 32 Oklahoma's constitutional provisions regarding use of trust proceeds designated for the permanent school fund are similar to our provisions governing all permanent funds:

*All proceeds of the sale of public lands ... given by the United States for the use and benefit of the common schools of this State, ... shall constitute the permanent school fund, the income from which shall be used for the maintenance of the common schools in the State. The principal shall be deemed a trust fund held by the State, and shall forever remain inviolate. It may be increased, but shall never be diminished.... [N]o portion of said fund shall be diverted for any other use or purpose.*

Okla. Const. art. 11, § 2 (emphasis added). Also, another provision provides:

*The interest and income of the permanent school fund, the net income from the leasing of public lands which have been or may be granted by the United States to the State for the use and benefit of the common schools ... shall be used ... for the benefit of the common schools ... and no part of the fund shall ever be diverted from this purpose, or used for any other purpose than the support and maintenance of common schools for the equal benefit of all the people of the State.*

*Id.* at § 3 (emphasis added). The above language is similar to Article 10, Section 7, and Article 11, Section 8, of the Arizona Constitution.

¶ 33 In *Rhoades*, the Nevada Supreme Court determined that its constitution permitted the use of proceeds of sales of state trust land to pay general management expenses of the trust. *Rhoades*, 4 Nev. 312, 1, 3.[12] However, Nevada's constitution, as set forth in Rhodes, varies from ours because it does not contain language similar to our constitution's Article 10, Section 7(B):

*All lands ... donated for the benefit of public schools ... to enable the people of Nevada territory to form a State government, ... and all proceeds of lands that have been, or may hereafter be granted ... by the United States to this State, provided, ... the same are hereby solemnly pledged for educational purposes, and shall not be transferred to any other fund*

---

11. The court found Oklahoma's enabling act did not prohibit such use. *Id.*

12. The pincite refers to the page numbers on Westlaw.

*for other uses; ...* provided, that the interest only of the aforesaid proceeds shall be used for educational purposes, and any surplus interest shall be added to the principal sum; *and provided further,* that such portions of said interest as may be necessary, may be appropriated for the support of the State university.

4 Nev. at 2 (quoting Nev. Const. art. 11, § 3) (second emphasis added). Noting the framers' intentions were not very clear, the court concluded "[p]robably the intent was only to prohibit the legislature from using the funds ... for internal improvements or any other branch of State expenditure except that immediately connected with our educational system." *Id.* at 3.

¶ 34 Thus, the only courts deciding this issue before 1912 disagreed about the constitutionality of using proceeds of trust lands to pay for managing the lands; therefore, the cases do not inform us of the Arizona framers' intent in drafting Article 10, Section 7(B). Given that Oklahoma and Nevada reached different conclusions, we are not persuaded by the Commissioner's argument that the framers of the Arizona Constitution, presumed to know the law, intended the language of section 7(B) to permit use of trust assets for trust management. Rather, in light of the divided legal landscape, it is more likely that the framers in 1912 would have included an explicit provision in the Constitution to permit such diversion of trust funds and assets if that was their intent. *See Empress Adult Video & Bookstore v. City of Tucson,* 204 Ariz. 50, 62, ¶ 29, 59 P.3d 814, 826 (App.2002) (stating the constitutional "framers were presumably aware of existing law"), *disapproved on other grounds by State v. Stummer,* 219 Ariz. 137, 144 n. 6, ¶ 22, 194 P.3d 1043, 1050 n. 6 (2008).

¶ 35 The Commissioner also relies on *United States v. Swope,* 16 F.2d 215 (8th Cir. 1926), arguing that use of trust proceeds to pay management expenses of trust assets is allowed under common law. In *Swope,* the court determined the Enabling Act did not prohibit a New Mexico law that allowed the "state lands maintenance fund," derived from twenty percent of the proceeds from any state lands, be used to pay "all salaries and

expenses of the state land office,". 16 F.2d at 216, 218. The court applied the common law of trusts, which allows payment of expenses of managing the trust from the corpus of the trust when there is no provision specifying payment of management expenses. *Id.* at 217–18. In doing so, it relied upon the decisions in *Rhoades* and *Betts* and upon the absence of any provision forbidding the use of trust proceeds to pay trust expenses. *Id.* at 218–19.

¶ 36 The *Swope* decision is distinguishable. Given our supreme court's restrictive reading of these provisions limiting the use of trust assets, we do not accept the contrary view of a 1926 decision of a federal circuit court. Moreover, *Swope* is based on an analysis of the Enabling Act, which is not at issue here, and it failed to mention that the *Betts* court held unconstitutional the same practice. Further, Nevada's constitution does not contain a provision similar to our Article 10, Section 7(B).

¶ 37 Furthermore, in territorial days, Arizona was no stranger to Congressional mandates permitting more diverse use of land granted to it. In 1896, Arizona received authorization to lease lands for educational use. Act to Authorize the Leasing of Lands for Educational Purposes in Arizona, 29 Stat. 90–91 (1896). That authorization included the provision that "all necessary expenses and costs incurred in the leasing, management, and protection of said lands and leases may be paid out of the proceeds derived from such leases." *Id.* at 91. Even more, Section 27 of the Enabling Act provides:

That five per centum of the proceeds of sales of public lands ... which shall be sold by the United States subsequent to the admission of said state into the Union, *after deducting all the expenses incident to such sales,* shall be paid to the said state to be used as a permanent inviolable fund, distributions from which shall be made in accordance with the first paragraph of section 28 and shall be expended for the support of the common schools within said state.

(Emphasis added.)

¶ 38 Section 27 and the 1896 law indicate the framers knew that express statutory lan-

guage was required to allow the practice of using proceeds from the sale or rental of trust lands to pay for management expenses. Thus, if the framers had wanted to permit a more diverse use of land granted under the Enabling Act, they would have included similar language in Article 10, Section 7(B), of the Arizona Constitution.

¶ 39 Accordingly, we disagree that common-law trust principles were imputed to our trust-land scheme on the theory Congress and the constitutional framers knew of prior courts' decisions that trust land proceeds could pay for management expenses.

■■ ¶ 40 The Commissioner's last argument is also unpersuasive. She argues the framers intended payment of management expenses from trust proceeds because the legislature allowed "payment of expenses of timber sales on university lands from the university's permanent fund." In 1915, the legislature passed an act providing for "the systematic administration, care and protection of the state lands," and the creation of the State Land Department and the office of Commissioner of State Lands. 1915 Ariz. Sess. Laws, ch. 5, preamble (2d Spec. Sess.). Section 78 of that act, now codified in A.R.S. § 37–482(B) (2003), created the "University Timber Account Fund," from which the "expenses incurred by the commissioner for the care, sale and other administration of timber or timber products, upon lands granted for university purposes, shall be kept by the commissioner in a separate account and said expenses shall be a charge against the said university fund." The Commissioner argues that since the 1915 legislature permitted diversion of some funds derived from trust lands, the constitutional framers must have intended such diversion of funds.

■■ ¶ 41 We disagree with the Commissioner. It is more hazardous to infer the intent of constitutional framers by the acts of subsequent legislatures than it is to infer the intent of a legislature from acts of an earlier one. *See United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960) (stating "the views of a subsequent [legislative body] form a hazardous basis for infer-

ring the intent of an earlier one"); *Calik v. Kongable,* 195 Ariz. 496, 501, ¶ 21, 990 P.2d 1055, 1060 (1999) (stating "the subsequent enacting body is often not the same as the one that enacted the original legislation"); *Joffe v. Acacia Mortg. Corp.,* 211 Ariz. 325, 334, ¶ 38, 121 P.3d 831, 840 (App.2005) (quoting *Price,* 361 U.S. at 313, 80 S.Ct. 326).

¶ 42 While the 1915 legislature may have impliedly construed Article 10, Section 7, to permit other uses, we give greater consideration to the purpose of the land grant and reasoning behind Congress's restrictive provisions, which Arizona adopted and made more restrictive.

¶ 43 In the twenty-three states that entered the union through acts of admission, organic acts, and enabling acts prior to Arizona's statehood, Congress failed to designate someone "to keep invested funds derived from disposition of granted lands." *Murphy,* 65 Ariz. at 351, 181 P.2d at 344. Consequently, a scandal erupted in virtually every state because the lands "were so poorly administered" and "so unwisely invested" that the lands dissipated, which was "sanctioned or permitted by the [state] legislatures." *Id.*

¶ 44 Thus, Congress made sure, "in light of experiences of the past, that such would not occur in the new states of New Mexico and Arizona." *Id.* Congress effectively "circumscribe[d] the state in its use and disposition of the lands granted in trust to the state by the United States, as well as any proceeds derived from their sale or from sale of natural products thereof." *Id.* at 350, 181 P.2d at 343–44.

¶ 45 We should not determine the intent of the framers by the actions of the legislature three years later. The restrictive provisions, their cause, and the purpose of the land grant to provide the most substantial benefit possible to the trust beneficiaries, *Lassen,* 385 U.S. at 467–68, 87 S.Ct. 584, all outweigh the 1915 legislature's implied construction of our constitution. Thus, the Commissioners argument is unpersuasive.[13]

---

**13.** The constitutionality of A.R.S § 37–482 is not before us.

474

### IV. Attorneys' fees

¶ 46 The trial court awarded Plaintiffs attorneys' fees pursuant to A.R.S. §§ 12–2030 (2003) and 35–213(C) (2011) and the private attorney general doctrine set forth by *Arnold v. Department of Health Services,* 160 Ariz. 593, 775 P.2d 521 (1989). It also awarded Plaintiffs their costs. The Commissioner did not dispute the trial court's method of calculating the award and merely states that if we were to reverse the trial court, Plaintiffs would not be the prevailing party.

¶ 47 Because Plaintiffs prevail on appeal, we affirm the trial court's award of attorneys' fees. The Commissioner concedes that Plaintiffs would be entitled to attorneys' fees on appeal under the private attorney general doctrine if we affirm. We agree and grant Plaintiffs' request for reasonable attorneys' fees and costs on appeal subject to compliance with Arizona Rule of Civil Appellate Procedure 21.

### CONCLUSION

¶ 48 We affirm the trial court's entry of summary judgment for Plaintiffs/Appellees.

CONCURRING: MARGARET H. DOWNIE, Presiding Judge, and PETER B. SWANN, Judge.