SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| RAE ANN RUMERY; JOHN SKARHUS; and CARTWRIGHT ELEMENTARY SCHOOL DISTRICT, | ) Arizona Supreme Court<br>) No. CV-11-0358-PR<br>)<br>) Court of Appeals |
| Plaintiffs/Appellees, | ) Division One<br>) No. 1 CA-CV 10-0807 |
| v. | )<br>) Maricopa County |
| MARIA BAIER, in her capacity as Arizona State Land Commissioner, | ) Superior Court<br>) No. CV2010-012871<br>) |
| Defendant/Appellant, | ) |
| and | ) **O P I N I O N**<br>) |
| DOUG DUCEY, in his capacity as State Treasurer, | )<br>)<br>) |
| Defendant. | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Gary E. Donahoe, Judge (Ret.)

**AFFIRMED**

_____

Opinion of the Court of Appeals, Division One
228 Ariz. 463, 268 P.3d 1120 (2011)

**VACATED**

_____

ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST            Phoenix
     By   Timothy M. Hogan
          Joy E. Herr-Cardillo
Attorneys for Rae Ann Rumery, John Skarhus, and Cartwright
Elementary School District

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                Tucson
     By   David F. Jacobs
Attorney for State Land Commissioner Maria Baier

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                Phoenix
     By   Rex C. Nowlan, Assistant Attorney General
          Eryn McCarthy, Assistant Attorney General
Attorneys for State Treasurer Doug Ducey

LASOTA & PETERS PLC                                      Phoenix
     By   Donald M. Peters
Attorney for Amici Curiae Arizona School Boards Association
and Arizona Association of School Business Officials

FENNEMORE CRAIG, P.C.                                    Phoenix
     By   Timothy Berg
          Theresa Dwyer-Federhar
          Michael J. Phalen
          Meredith K. Marder
Attorneys for Amici Curiae Valley Partnership, Arizona Chapter
of Associated General Contractors of America, Arizona Chamber of
Commerce and Industry, Arizona Mining Association, Arizona Rock
Products Association, County Supervisors Association of Arizona,
Greater Phoenix Leadership, International Council of Shopping
Centers, and League of Arizona Cities and Towns

OFFICE OF THE GOVERNOR                                   Phoenix
     By   Joseph Sciarrotta, Jr.
Attorney for Amicus Curiae Governor Janice K. Brewer

MARISCAL, WEEKS, MCINTYRE & FRIEDLANDER, P.A.            Phoenix
     By   Gary L. Birnbaum
          Michael S. Rubin
Attorneys for Amicus Curiae Superintendent of Public
Instruction John Huppenthal

ARIZONA EDUCATION ASSOCIATION                            Phoenix
     By   Samantha E. Blevins
Attorney for Amicus Curiae Arizona Education Association
_____

**B A L E S**, Vice Chief Justice

¶1      Arizona's Constitution directs that "whenever any monies shall be in any manner derived from" state trust lands, the monies "shall be deposited" into a permanent fund to serve the purpose for which the land was granted.  Ariz. Const. art.

2

10, § 7(A). We hold that A.R.S. § 37-527 (Supp. 2012) violates this provision by diverting up to ten percent of certain trust land proceeds to a management fund rather than depositing them into a permanent fund.

## I.

## A.

¶2 In 1910, Congress passed the New Mexico–Arizona Enabling Act, granting Arizona more than ten million acres of land to be held in trust for designated public purposes, including some eight million acres for the "support of common schools." Act of June 20, 1910, ch. 310, §§ 24, 25, 36 Stat. 557; *Lassen v. Arizona ex rel. Ariz. Highway Dep't*, 385 U.S. 458, 460 n.2 (1967). To ensure that the beneficiaries derive the full benefit of the land grants, the Enabling Act imposes detailed restrictions on the sale of trust lands and the use of trust funds. *Lassen*, 385 U.S. at 466–68; *see* Enabling Act § 28.

¶3 By ratifying our state constitution, Arizona's voters accepted the land grants and incorporated the Enabling Act into "the organic law of this state." *Kadish v. Ariz. State Land Dep't*, 155 Ariz. 484, 486, 747 P.2d 1183, 1185 (1987), *aff'd sub. nom. ASARCO Inc. v. Kadish*, 490 U.S. 605 (1989). Article 10, Section 1 of Arizona's Constitution declares that the lands received shall be "held in trust" and disposed of only as provided in the Enabling Act and the Arizona Constitution, and

3

that "[t]he natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands" themselves.

¶4 Additional restrictions on the use of proceeds from state trust lands are contained in Article 10, Section 7, which provides in part:

> A. A separate permanent fund shall be established for each of the several objects for which the said grants are made and confirmed by the enabling act to the state, and whenever any monies shall be in any manner derived from any of said lands, the same shall be deposited by the state treasurer in the permanent fund corresponding to the grant under which the particular land producing such monies was, by the enabling act, conveyed or confirmed.
>
> B. No monies shall ever be taken from one permanent fund for deposit in any other, or for any object other than that for which the land producing the same was granted or confirmed.

Sections 7(A) and (B) restate provisions from Section 28 of the original Enabling Act. Although this language was later deleted from the Enabling Act, Act of Aug. 28, 1957, Pub. L. No. 85-180, 71 Stat. 457, it has remained in our constitution since statehood.

¶5 Monies deposited into a permanent fund "shall be invested in safe interest-bearing securities and prudent equity securities." Ariz. Const. art. 10, § 7(C). Based on the earnings from assets in a particular permanent fund, annual distributions are made to promote the fund's objectives. *See*

4

*id.* § 7(G) (authorizing distributions based on five-year averages for annual rates of return, reduced by an inflation index, and fund's average market value); Ariz. Const. art. 11, §§ 8, 10 (establishing permanent state school fund and authorizing use of earnings for maintenance of state educational institutions).

¶6     Trust lands granted for the support of common schools also are governed by statutory provisions. *See* A.R.S. § 37-521. The statute directs that proceeds from trust lands and the sale of natural products from such lands, such as timber, minerals, or gravel, shall be deposited into the permanent state school fund. *Id.* § 37-521(A). The statute declares that the fund "shall be and remain a perpetual fund." *Id.* at (B). As amended by a 2002 referendum, the statute specifies how expendable earnings from the fund shall be used and directs that certain excess amounts shall be deposited into a classroom site fund for use by school districts to fund operations. *Id.* § 37-521; *see id.* § 15-977.

¶7     The State Land Department is responsible for administering the trust lands, *Forest Guardians v. Wells*, 200 Ariz. 255, 257 ¶ 2, 34 P.3d 364, 366 (2001), but neither the Enabling Act nor Arizona's Constitution identifies how the administrative costs associated with managing the lands will be funded. For nearly 100 years, the legislature appropriated

monies from the state's general fund to pay the costs for generally administering the trust lands. In 2009, however, the legislature altered the funding scheme by enacting A.R.S. § 37-527. 2009 Ariz. Sess. Laws, ch. 5, § 9 (3d Spec. Sess.).

¶8 Section 37-527 allows the costs of administering the state trust lands to be paid from a newly established trust land management fund. The statute provides that, at the discretion of the State Land Commissioner, up to ten percent of the annual proceeds from "[e]ach beneficiary's trust lands" and "[a]ll sales of timber, mineral, gravel or other natural products or property from each beneficiary's trust lands" are to be deposited into the management fund. A.R.S. § 37-527(A). Monies in this fund are subject to legislative appropriation and are to be "used exclusively to manage trust lands." *Id.* at (C). The legislature also amended § 37-521 to provide that the permanent state school fund would consist of proceeds from state school trust lands "[a]fter any appropriation pursuant to section 37-527." 2009 Ariz. Sess. Laws, ch. 5, § 4 (3d Spec. Sess.).

¶9 Monies designated for the management fund are separated from trust land proceeds before the remaining proceeds are placed into a permanent fund. For fiscal year 2010, $9,773,500 was diverted to the management fund and appropriated to the State Land Department. *Id*. § 18. For fiscal year 2011, the State Land Commissioner directed that the full ten percent

6

of proceeds, or $10.5 million, be deposited into the management fund to pay for the operations of the State Land Department.

**B.**

**¶10** In 2010, Rae Ann Rumery, John Skarhus, and the Cartwright Elementary School District sued the Commissioner and the Treasurer, alleging that § 37-527 violates Section 28 of the Enabling Act and Article 10, Section 7 of the Arizona Constitution. They further contended that the statute violates the voter-protection provisions in Article 4, Part 1, Section 1(6) of the Arizona Constitution because it alters the distribution of monies under § 37-521 and was not approved by a three-quarters vote in each house of the legislature. The Commissioner defended § 37-527 by arguing that common law principles allow trust assets to be used to fund trust management and that the new statute does not alter A.R.S. § 37-521's formula for distributing expendable earnings from school trust lands.

**¶11** On cross-motions for summary judgment, the trial court ruled that § 37-527 violates both Article 10, Section 7 and the voter-protection provisions of Arizona's Constitution. The court enjoined the Commissioner from designating state trust land proceeds for deposit into the management fund, ordered the Treasurer to deposit all state trust land proceeds into the appropriate permanent fund, and ordered the Commissioner to

repay to the permanent funds all amounts previously diverted. The Commissioner appealed. (The Treasurer did not join the Commissioner's cross-motion or appeal the trial court's ruling.)

¶12 The court of appeals affirmed, agreeing with the trial court that § 37-527 violates Article 10, Section 7 by diverting trust land proceeds from the permanent state school fund. *Rumery v. Baier*, 228 Ariz. 463, 465 ¶ 1, 268 P.3d 1120, 1122 (App. 2011). The court of appeals did not address the trial court's ruling that the statute also violates the voter-protection provisions. *Id.* at n.3.

¶13 We granted review because whether the Arizona Constitution allows the costs of managing state trust lands to be paid from trust land proceeds is an issue of statewide importance. The Court has jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24 (2009).

## II.

### A.

¶14 Our resolution of this case turns on Article 10, Section 7(A)'s directive that "whenever any monies shall be in any manner derived from" any of the state trust lands, "the same shall be deposited by the state treasurer" into the permanent fund corresponding to the particular land grant.

¶15 "The 'Constitution should be construed so as to ascertain and give effect to the intent and purpose of the

8

framers and the people who adopted it.'" *Brewer v. Burns*, 222 Ariz. 234, 239 ¶ 26, 213 P.3d 671, 676 (2009) (quoting *State ex rel. Morrison v. Nabours*, 79 Ariz. 240, 245, 286 P.2d 752, 755 (1955)). We do so by fairly interpreting the language used and, unless the context suggests otherwise, giving words "their natural, obvious and ordinary meaning." *Id.*

¶16 By its terms, Article 10, Section 7(A) requires proceeds from the sale of state trust lands and of natural products from such lands to be deposited into a permanent fund. The language does not permit diverting proceeds instead to a management fund. Nor does the context suggest that Section 7(A)'s language should be interpreted to mean something other than what it says.

¶17 In interpreting Article 10, Section 7(A), we are guided by decisions construing the Enabling Act. *Cf. Kadish*, 155 Ariz. at 486, 747 P.2d at 1185 (noting that interpreting restrictions on disposition of trust lands requires "an understanding of the historical process from which [the Act] evolved"). The Act's restrictions regarding state trust lands reflect "Congress' concern both that the [land] grants provide the most substantial support possible to the beneficiaries and that only those beneficiaries profit from the trust." *Lassen*, 385 U.S. at 467. Consistent with this purpose, the United States Supreme Court has refused to allow the disposition of

9

trust assets or proceeds for purposes other than those specified in the Enabling Act, even when the proposed use arguably would benefit the trust overall.

**¶18**     The Supreme Court long ago held that the Enabling Act prevented New Mexico from using income from its trust lands to promote the state and its resources generally. *Ervien v. United States*, 251 U.S. 41, 47–48 (1919). New Mexico argued that such payments were appropriate for administering the trust estate because they would foster the sale and leasing of trust lands. *Id.* at 47. Rejecting this argument, the Supreme Court noted that the Enabling Act specifically enumerated the purposes for which the trust lands had been granted, "and to make assurance doubly sure it was provided that the natural products and money proceeds of such lands should be subject to the same trusts as the lands producing the same." *Id.* The Court held that the Enabling Act precluded "any license of construction or liberties of inference" that would allow the use of trust land proceeds for purposes other than those recognized in the Enabling Act itself. *Id.*

**¶19**     In 1967, the Supreme Court reaffirmed *Ervien*'s interpretative approach in *Lassen*. 385 U.S. at 467. There the Court held that the Enabling Act barred Arizona's long-standing practice of allowing the State Highway Department to take material sites and rights of way from state trust lands without

10

compensating the trusts. *Id*. at 466. The rationale for this practice, which our Court had approved, was that the highways constructed across trust lands would enhance the remaining trust lands by at least the value of the property taken. *See id*. at 460. Without questioning this premise, the Supreme Court held that "[t]he Enabling Act unequivocally demands both that the trust receive the full value of any lands transferred from it and that any funds received be employed only for the purposes for which the land was given." *Id.* at 466. To ensure that the beneficiaries "derive the full benefit of the grant," the Court held that "Arizona must actually compensate the trust in money for the full appraised value of any material sites or rights of way which it obtains on or over trust lands." *Id.* at 469 (footnotes and internal quotations omitted).

¶20 We have similarly recognized, in dealing with state trust lands, that "all doubts must be resolved in favor of protecting and preserving trust purposes." *Kadish*, 155 Ariz. at 495, 747 P.2d at 1194. Applying this principle, *Kadish* held that a state statute mandating flat-rate royalties for certain mineral leases violated the requirements in the Enabling Act and Arizona Constitution that trust lands be leased for their true, appraised value. *Id.* at 495-97, 747 P.2d at 1194-96. Although those defending the statute argued that it would promote mineral exploration and development and thereby increase payments to the

11

state, we held that this prospect could not justify departing from the Enabling Act's requirements. *Id.* at 496–97, 747 P.2d at 1195–96.

**¶21** The Commissioner correctly observes that cases such as *Ervien*, *Lassen*, and *Kadish* did not involve Article 10, Section 7(A) of Arizona's Constitution or the use of trust assets to pay the costs of managing trust lands. Those cases, however, are relevant for what they teach about interpreting the constitutional restrictions on the disposition of trust assets: courts may not permit use of trust lands or their proceeds in ways not expressly authorized, even if doing so would benefit the trust. As *Kadish* observed, "we must strictly apply the Enabling Act's restrictions regarding disposal of school trust assets." 155 Ariz. at 488, 747 P.2d at 1187; s*ee also Murphy v. State*, 65 Ariz. 338, 353, 181 P.2d 336, 346 (1947) (noting that "*every act of the legislature that in any manner circumvents the plain provisions of the Enabling Act is struck down as unconstitutional and void*").

**¶22** Because Article 10 retains certain restrictions that were later deleted from the Enabling Act, the latter "merely sets out the minimum protection for our state trust land." *Deer Valley Unified Sch. Dist. v. Superior Court*, 157 Ariz. 537, 541, 760 P.2d 537, 541 (1988). Thus, consistent with the approach taken in *Ervien*, *Lassen*, and *Kadish*, we apply Article 10,

12

Section 7 according to its terms and decline to infer unstated exceptions to its restrictions on the use of state trust land proceeds.

**B.**

**¶23**        In defending A.R.S. § 37-527, the Commissioner notes that the Enabling Act and the Arizona Constitution are silent on how the costs of managing the state trust lands will be funded. She also observes that spending trust proceeds on trust land management directly benefits the trust and its beneficiaries, that the common law generally allows trust assets to be used for trust administration, and that other courts have approved the use of proceeds from state trust lands to pay for trust management, citing *United States v. Swope*, 16 F.2d 215 (8th Cir. 1926), *Betts v. Comm'rs of the Land Office*, 110 P. 766 (Okla. 1910), and *State ex. rel. Greenbaum v. Rhoades*, 4 Nev. 312 (1868).

**¶24**        The Constitution's silence on the payment of the costs of trust management and the fact that such expenditures might benefit the trusts are not sufficient grounds for reading exceptions into our Constitution and Enabling Act. As explained, *supra* ¶¶ 16-22, when the Constitution or the Enabling Act specifies a particular disposition of trust assets, we may not infer exceptions to the stated requirements, even if doing so arguably could benefit the trust overall. Here, Article 10,

13

Section 7(A) explicitly directs that monies derived from state trust lands be deposited into the relevant permanent fund.

¶25 The language of Article 10, Section 7(A) also answers the argument based on the common law of trusts. Such law is relevant in defining the Commissioner's powers and duties. *See, e.g., Forest Guardians*, 201 Ariz. at 262 ¶ 20, 34 P.3d at 371. The common law generally allows a trustee to use trust assets to pay trust administration costs. Restatement (Third) of Trusts § 38 (2003) ("A trustee is entitled to indemnity out of the trust estate for expenses properly incurred in the administration of the trust."). But a trustee's common law powers may be limited by the terms of the trust. *See id.* § 85 (2007) (providing that a trustee's powers can be "limited by statute or the terms of the trust"). Here, Article 10, Section 7(A) directs the state treasurer to deposit trust proceeds into a permanent fund. This constitutional language, not being subject to implied exceptions, controls over the common law of trusts. *Cf. Ervien*, 251 U.S. at 47–48 (noting that the United States, as grantor of lands under Enabling Act, had "impose[d] conditions upon their use").

¶26 For similar reasons, we are not persuaded by the out-of-state cases. In *Swope*, the United States Court of Appeals upheld a New Mexico statute that allocated twenty percent of the income from state trust lands to a maintenance fund for paying

14

the costs of the state land office.  16 F.2d at 216, 219.  *Swope* held that such payments were not prohibited by the Enabling Act, noting the common law principle of allowing the payment of the costs of trust administration from trust assets.  *See id.* at 217.  *Swope* also cited the 1868 Nevada decision in *Rhoades* and the 1910 Oklahoma decision in *Betts* as other cases approving the use of monies derived from trust lands to pay the expenses of managing the lands.  *Id.* at 217–18.

¶27    Although *Swope* interpreted language in the Enabling Act identical to that in Arizona's Constitution, the federal decision is neither binding nor persuasive here.  *Swope* gives insufficient weight to the explicit language in Article 10, Section 7(A) directing that "whenever any monies shall be in any manner derived" from state trust lands, such monies "shall be deposited" into a permanent fund.  Even less persuasive are *Rhoades* and *Betts*, cases that involved enabling acts and state constitutions with language different from that in Article 10, Section 7.  *Rhoades* compared the state to an "ordinary trustee" in allowing the expenses of the state land office to be paid from trust proceeds, *see* 4 Nev. at 317, and *Betts* approved only the payment of trust expenses from the "net income" from leasing certain trust lands.  110 P. at 767–68.  Neither case supports allowing this Court to disregard Article 10, Section 7(A)'s requirement for the disposition of proceeds from Arizona trust

15

lands. *Cf. Murphy*, 65 Ariz. at 350–53, 181 P.2d at 344–46 (noting that out-of-state cases are of little precedential value for interpreting Arizona's Enabling Act because the latter "marked a complete and absolute departure from the enabling acts" of other states).

### III.

**¶28** We hold that A.R.S. § 37-527 violates Article 10, Section 7(A) of Arizona's Constitution by diverting proceeds from state trust lands to a management fund. We affirm the trial court's entry of summary judgment for Appellees and vacate the opinion of the court of appeals. We also grant Appellees' request for an award of attorney's fees, as the Commissioner conceded below that Appellees would be entitled to a fee award under the private attorney general doctrine if they prevailed.

_____
Scott Bales, Vice Chief Justice


CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
A. John Pelander, Justice


16

_____
Robert M. Brutinel, Justice


_____
Virginia C. Kelly, Judge*



*Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Virginia C. Kelly, Judge of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.